**SCOVILL MANUFACTURING COMPANY, a corporation, Plaintiff-Appellant,**

v.

**DATELINE ELECTRIC CO., Ltd., a corporation, Defendant-Appellee.**

**No. 71-1344.**

United States Court of Appeals, Seventh Circuit.

April 12, 1972.

Rehearing Denied May 15, 1972.

Merle L. Royce, II, Donald A. Mackay, Chicago, Ill., for plaintiff-appellant; Leibman, Williams, Bennett, Baird & Minow, Chicago, Ill., of counsel.

Thomas R. Mulroy, John L. Conlon, Glen H. Kanwit, Chicago, Ill., for defendant-appellee; Hopkins, Sutter, Owen, Mulroy & Davis, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

SWYGERT, Chief Judge.

The question presented for review is whether a federal district court in Illinois acquired personal jurisdiction over an English corporation in a diversity action for breach of contract. The district court, 319 F.Supp. 772, in applying the Illinois "long arm" statute, Ill.Rev.Stat. ch. 110 § 17 (1969),[1] held that jurisdiction over the defendant had not been acquired. We take the opposite view and reverse.

The plaintiff, Scovill Manufacturing Company, a Connecticut corporation, is engaged in the manufacturing and marketing of electric housewares products. The defendant, Dateline Electric Company, Ltd., an English corporation, is a manufacturer of electric housewares products. In 1968 Scovill became interested in marketing a line of electric hair curler sets, but lacked manufacturing facilities. At the July 1968 Housewares Show, the principal housewares industry trade show held twice yearly in Chicago, contact was made between representatives of Scovill and Dateline which, following negotiations in Chicago and elsewhere, resulted in a contract whereby Dateline was to manufacture hair curling sets for Scovill. After delivery under the contract had begun, a dispute arose over the quality of the sets. On October 1, 1969 Scovill terminated the contract for nonperformance and requested that Dateline return certain tooling owned by Scovill. The request was refused. Thereafter, Dateline attempted to dispose of a large quantity of the sets intended for Scovill to various outlets. These attempts were made in Chicago at the January 1970 Housewares Show.

The foregoing events precipitated the instant suit. The first three counts of the complaint alleged trademark and trade name infringements based on the claim that Dateline wrongfully solicited orders bearing the trademarks and trade names "Scovill" and "Hamilton Beach" (a division of Scovill) during the January 1970 Housewares Show in Chicago. The relief sought was an injunction

---

1. Section 17 provides in pertinent part:
   (1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:
   (a) The transaction of any business within this State;
   (b) The commission of a tortious act within this State.

to prohibit Dateline from offering the sets for sale and an accounting to Scovill for all profits realized by Dateline from the sale of such sets. Count IV presented a claim for damages premised upon Dateline's alleged breach of the written contract between Scovill and Dateline.

Subject matter jurisdiction was based upon the Lanham Trademark Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. § 1338, and diversity of citizenship, 28 U.S.C. § 1332. Service of process was made in England pursuant to Rule 4(e), Fed.R. Civ.P. and sections 16 and 17 of the Illinois Civil Practice Act, Ill.Rev.Stat. ch. 110. Since the first three counts asserted tort claims allegedly committed in Illinois, Dateline conceded that service was proper under these counts, but moved to quash service and dismiss Count IV for want of personal jurisdiction.[2] The district court granted the motion and this appeal followed.

Several grounds are advanced by Scovill for maintaining that service on Dateline as to the contract claim was legally effective. First, Scovill claims that the "transacting business" test under section 17(1) (a) was met. Second, Scovill argues that the acts of infringement, "coming upon the heels of the breach and arising directly from it," are inseparable from the contract dispute and thus provide a basis for the proper application of section 17(1) (b). Third, Scovill maintains that Dateline's activities in Illinois were so extensive that it could be said that the defendant was "doing business" within the state under the Illinois common law jurisdictional standard for nonresidents. Finally, Scovill contends that the contract claim is so interrelated with the infringement claims that under the doctrine of pendent jurisdiction the district court entertaining jurisdiction on Counts I, II, and III acquired jurisdiction over the defendant with respect to Count IV. In-

asmuch as we are convinced that the facts justify the conclusion that the "transacting business" test under section 17(1) (a) has been met, we need not consider the other reasons advanced by Scovill for validating the service.

The record shows that many of Dateline's products are manufactured for sale by other electric housewares companies under their own trademarks or "private labels." Since the beginning of 1967 a representative of Dateline has attended each of the semi-annual housewares shows in Chicago for the purpose of contacting prospective customers and soliciting private label contracts.

At the July 1968 Housewares Show Scovill's product manager for hair curler sets, Larry Pugh, was contacted by Hugh Sims-Hildich, Dateline's managing director and principal salesman. Sims-Hildich told Pugh that Dateline would be willing to make sets for Scovill, and Pugh, in turn, expressed an interest in the transaction. They then discussed possible prices, quantities, and the range of models that might be involved.

Thereafter, in September 1968, negotiations were conducted by representatives of the two companies in New York City and in October, in Waterbury, Connecticut, at which time a proposed agreement was submitted by Dateline. Further discussions were carried on by letter, transatlantic telephone, and Telex. By December Scovill had executed a contract and sent it to England, where it had been executed by Dateline. Because this copy was delayed in the mail, the contract was reexecuted in Waterbury upon Sims-Hildich's return to the United States in January 1969.

Although the contract had been signed, the parties continued to discuss various aspects of the proposed design of the hair curler sets. These discussions took place early in January 1969 in New York City and later in the month at the Housewares Show in Chicago,

---

**2.** Subsequently, Dateline defaulted for want of answer on Counts I through III and thereafter a permanent injunction against further infringement was entered.

where Sims-Hildich and a representative of Scovill met several times. At the July 1969 Housewares Show, Sims-Hildich again met with representatives of Scovill to examine samples of the initial sets manufactured by Dateline, to discuss a problem that had arisen in connection with the latch mechanism of the hair curler sets, and to review the art work for the product cartons.

We are of the opinion that the district court erred in treating the contacts between the parties in Illinois as "nonsubstantial" and "fortuitous." Rather, we think these contacts were of such importance and substantiality as to meet the "minimum contacts" test that underlines the definition of transacting business encompassed by section 17(1) (a) of the Illinois Civil Practice Act. Dateline's activity within Illinois in connection with the contract in issue was much more extensive than that occurring in National Gas Appliance Corp. v. A. B. Electrolux, 270 F.2d 472 (7th Cir. 1959), cert. denied, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 542 (1960), and Kropp Forge Co. v. Jawitz, 37 Ill.App.2d 475, 186 N.E.2d 76 (1962), where personal jurisdiction over nonresident defendants was sustained under section 17(1) (a).

Moreover, Dateline's Illinois contacts cannot be considered "casual" or "incidental" as the contacts of a nonresident defendant were characterized in Kaye-Martin v. Brooks, 267 F.2d 394 (7th Cir.), cert. denied, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959). The three meetings between representatives of Scovill and Sims-Hildich in 1968 and 1969 in Chicago came about because of their regular attendance at the Housewares Show for business purposes. Indeed, the sole purpose of these shows was to promote business contacts and provide a place where business relationships would be initiated if not fully completed. Business needs prompted Scovill's periodic appearances. Dateline routinely attended the shows in order to solicit potential customers. The visits of Sims-Hildich were made to coincide with the shows since they represented an important part of Dateline's American business. A defendant who sends an agent into Illinois to solicit or to negotiate a contract is transacting business within the statutory definition. *See* Consolidated Laboratories, Inc. v. Shandon Scientific Co., Ltd., 384 F.2d 797 (7th Cir. 1967).

The fact that some of the important pre-contract negotiations were conducted elsewhere than Illinois and that the actual execution of the contract occurred outside of Illinois' borders is immaterial. Likewise immateral are the facts that the contract was not to be performed in Illinois or that it was to be governed by the law of Connecticut. In addition, we attach no significance to the fact that neither party is a resident of Illinois. Nonresidents as well as residents of Illinois have access to the Illinois courts and to the federal courts sitting in that state. The only requirement is that the court has jurisdiction over the subject matter and the parties.

Finally, we find that Dateline's contacts were sufficiently meaningful as to fulfill the due process requirements laid down in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), with respect to *in personam* jurisdiction over nonresidents. Our recent holding in Fisons, Ltd. v. United States, 458 F.2d 1241 No. Misc. 1235 (7th Cir., 1972), petition for cert. filed, 40 U.S.L. W. 3369 (U.S., Jan. 31, 1972) (No. 71–971), is applicable to the instant case: "We believe they [the parties] have purposefully availed themselves of the benefits and protections of local law and commerce, and that their contracts have significantly affected the way in which business is conducted in Illinois."

The dismissal of Count IV of the complaint is reversed.

KNOCH, Senior Circuit Judge (dissenting).

Reluctantly I find myself in disagreement with my colleagues in this matter.

I have, therefore, carefully reviewed the circumstances of this case in some detail, as follows.

It is plaintiff's view that defendant, an English manufacturer, is suable in Illinois under § 17(1) (a) because it regularly solicits private label contracts from American companies twice yearly at the industry trade show in Chicago and that personal jurisdiction also attaches to the breach of contract claims, which plaintiff sees as closely related to, and as arising from, the same business relationship whereby jurisdiction was obtained under § 17(1) (b) because of tortious acts of infringement in Illinois. Plaintiff also contends that defendant by regularly soliciting and negotiating manufacturing contracts and sales to resident Illinois companies and maintaining an account at a Chicago bank to convert its American contract payments to sterling, is "doing business" in Illinois under common law principles of jurisdiction for purposes of a suit on the contract solicited here. Further plaintiff's position is that the action for breach was pendent to the claims of trademark infringement where, as plaintiff asserts, the infringing goods were manufactured under the contract and offered for sale in violation of its terms. The infringement plaintiff argues, resulted from the breach. Plaintiff also contends that personal service of process need not be independently obtained with respect to an otherwise properly asserted pendent claim.

Defendant points out that its contacts with Illinois, as described, amount only to occasional solicitation of business in Chicago, that it has actually shipped sets into Illinois for one customer only and that those sets were sent f. o. b. England. Defendant also argues that there is no common nucleus of operative facts between the first three counts and Count IV to support application of the doctrine of pendent jurisdiction, which would also involve not only questions of the District Court's power to hear but its discretion as to whether to hear a particular matter.

Count IV referred to a written contract dated November 30, 1968, between plaintiff and defendant, relating to manufacture of hair curler sets to begin in 1969. Plaintiff alleged a failure to manufacture acceptable sets. Damages were sought for lost anticipated profits and advertising expense for the 1969 Christmas selling season, expenses incurred in inspection, test and repair of 15,000 sets which had been accepted by plaintiff (outside of Illinois) and for depreciation of tooling located in England. Jurisdiction is based on diversity of citizenship. Plaintiff is a Connecticut corporation. Its principal place of business is in Westbury, Connecticut. Through its Hampton Beach division it is engaged in the manufacture of electric houseware products. Defendant is an English corporation located in Battle, Sussex, United Kingdom.

The written contract on which Count IV is based was negotiated by representatives of plaintiff and defendant's president, Hugh J. Sims-Hilditch, in Connecticut and New York. It was executed in Connecticut. It was to be performed in England. By its terms it was to be "governed by the laws of the State of Connecticut". The contract provided further that any dispute as to meaning, interpretation or application of its terms, was to be settled by arbitration in New York in accordance with the rules of the American Arbitration Association, who were empowered by the contract to grant an award for damages including lost profits. The breach to which Count IV refers did not occur in Illinois.

Plaintiff asserts that the contract was initiated in Chicago at the July 1968 Housewares Show when Mr. Sims-Hilditch, who is also defendant's managing director and principal salesman, informed Larry Pugh, defendant's general market manager for electric hair curler sets, of defendant's willingness to make

such sets for plaintiff which lacked facilities for their manufacture.

Plaintiff asserts that Mr. Sims-Hilditch made a full, if preliminary, sales presentation to Mr. Pugh telling him that defendant made similar products for Montgomery Ward and Company and Westinghouse Electric Corporation and that he had solicited orders from Ronson and Sunbeam, including some indication of prices for possible manufacture for plaintiff. They agreed to discuss the matter further.

Preliminary meetings were held in New York City between Mr. Pugh, Joseph Cole, who was responsible for developing the sets for plaintiff, and Mr. Sims-Hilditch the following September where possibilities were discussed but no agreement reached and in Waterbury, Connecticut, the next October where terms were roughly drafted. The terms of the contract were negotiated by letter, trans-Atlantic telephone and Telex in November.

In December 1968 plaintiff prepared and executed a contract which was mailed to England where Mr. Sims-Hilditch signed it for defendant in December 1968. When this contract was delayed in the mails, the parties re-executed the contract in Waterbury in January 1969. The sets were to be delivered in New York City or at plaintiff's direction in Norfolk, Virginia.

There was further negotiation on engineering details, design and packaging in New York City, January 9, 1969; in Waterbury, January 8, January 10, and January 11, 1969; in England in the Spring and Summer of 1969; and at the January and July 1969 Housewares Show in Chicago. Mr. Sims-Hilditch testified that the design had already been agreed on and that at the January 1969 Show the parties only examined the types of sets offered by competitors. Mr. Cole testified they continued discussions of the design as well as examination of competitors' designs.

At the July Show 1969, final production models brought by Mr. Sims-Hilditch were approved by plaintiff, including a choice from three different prototype latch mechanisms.

It is clear that these meetings occurred in Chicago only because both parties were there attending the Housewares Show.

It had been agreed that the sets would be submitted by plaintiff to Underwriters' Laboratories for approval.

On September 22, 1969 after about 15,000 sets were delivered to plaintiff, at points outside Illinois, the Underwriters' Laboratory advised plaintiff it would not approve the sets. Plaintiff advised defendant it would accept the sets delivered but all other orders were canceled.

Nevertheless defendant shipped another 9,700 sets also delivered out of Illinois apparently at Norfolk, Virginia, and continued to manufacture until some time in October.

Meanwhile on October 1, 1969, plaintiff terminated the contract and requested (in December 1969 and January 1970) the return of the special tooling for which plaintiff had paid.

Although representatives of the parties and their counsel met in Waterbury, Connecticut, in October 1969 no settlement was reached.

Plaintiff learned of attempts made apparently on behalf of defendant, at the January 1970 Housewares Show, to sell sets made under the contract. Plaintiff filed suit in the U. S. District Court on February 3, 1970. Shortly thereafter, plaintiff also filed suit in the High Court of Justice, Queen's Bench Division, England, to recover possession of the same tooling referred to in Count IV. An amended complaint was filed in England in April 1970.

It is evidently undisputed that jurisdiction over Count IV is dependent on the law of Illinois and the limitations of due process. O'Hare International Bank v. Hampton, 7 Cir., 1971, 437 F.2d 1173, 1175. The question before us is: has there been a substantial connection with

the State of Illinois? Has defendant engaged in some act by which it may be said to have invoked the benefits and protections of the law of Illinois? Gray v. American Radiator and Standard Sanitary Corp., 1961, 22 Ill.2d 432, 440, 176 N.E.2d 761, 765. The majority would answer this question in the affirmative. I would not. As indicated there were three meetings in Chicago at the Housewares Show. In July Mr. Pugh who was not responsible for plaintiff's development of the sets spoke to Mr. Sims-Hilditch in a general way about the possibility of a contract. Later in January 1969, after execution of the contract, Mr. Cole, who was the man responsible for developing the sets, met Mr. Sims-Hilditch at the Show and continued discussions already had in New York respecting design. In July of that year sample sets already manufactured were received and the latch and art work for cartons discussed.

The meetings in Chicago were incidental contacts occurring there only because the parties were there to attend the Housewares Show. See Kaye-Martin v. Brooks, 7 Cir. 1959, 267 F.2d 394, 397, cert. den. 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75. The majority would distinguish Kaye-Martin on its facts, asserting that the defendant's attendance at the convention was unrelated to the single isolated meeting in Chicago arranged to accommodate the plaintiff-broker in that case, whereas here defendant's attendance at shows was designed to produce business and was related to the business giving rise to the dispute. The connection seems extremely tenuous to me and insufficient to support a claim that these convention attendances gave rise to the cause of action. National Television Sales, Inc. v. Philadelphia Television Broadcasting Co., N.D., Ill., E.D., 1968, 284 F.Supp. 68.

In Kropp Forge Co. v. Jawitz, 1962, 37 Ill.App.2d 475, 186 N.E.2d 76, and National Gas Appliance Corp. v. A. B. Electrolux, 7 Cir., 1959, 270 F.2d 472, cited in the majority opinion, the facts, in my view, were different. In *Kropp*

*Forge,* an action for contract damages, the contract was allegedly made by the defendant in person in Illinois with an Illinois resident to purchase machinery in Illinois.

In *Natural Gas* a substantial number of negotiation conferences occurred in Illinois, where the plaintiff National Gas was located. The written contract, which concerned work to be performed by plaintiff in Illinois, was sent to Illinois and accepted in Illinois.

Similarly Kokomo Opalescent Glass Co. v. Arthur W. Schmid International, Inc., 7 Cir., 1966, 371 F.2d 208, on which plaintiff relies, dealt with a contract negotiated in the forum State of Indiana with a company located there, for delivery and installation of a machine in plaintiff's Kokomo plant. A machine was installed which did not meet the terms of the contract. Consolidated Laboratories, Inc. v. Shandon Scientific Co., Ltd., 7 Cir., 1967, 384 F.2d 797, concerned breach of contract suit by an Illinois against an English corporation, where Consolidated had been Shandon's exclusive United States distributor since 1959. Shandon's representatives came twice to Illinois to discuss formalizing the relationship in writing. The subsequent written contract was sent to Illinois and executed there. In 1964 defendant's representative came to Illinois to discuss a new contract and the following year a number of discussions were held in Illinois on the new contract (which was the basis of the action) which was executed by plaintiff in Illinois. Products were shipped from England to Illinois and paid for in Illinois.

Ziegler v. Hodges and Houghton-Mifflin Co., 1967, 80 Ill.App.2d 210, 224 N.E.2d 12, also concerned a contract allegedly accepted and performed in Illinois by an Illinois resident.

On the other hand, plaintiff's principal place of business is in Connecticut, and defendant's principal place of business is in England. Discussions of the contract between Mr. Cole and Mr. Sims-Hilditch began in New York and

continued in Connecticut, with further negotiations by trans-oceanic communication between Connecticut and England. The written contract, prepared in Connecticut and executed there and in England, provided that it was to be interpreted under the laws of Connecticut and disputes settled by arbitration in New York. Design was discussed in Connecticut and New York. Machinery and tooling was obtained and the manufacturing carried out in England. No sets were shipped to plaintiff in Illinois. Discussion of the dispute occurred in Connecticut.

I share the position of the District Court that no real relationship with Illinois has been shown, and that it is clear neither party to the contract intended to invoke the benefit or protection of Illinois law. Unlike the circumstances in Fisons Limited v. United States of America, Misc. No. 1235, 458 F.2d 1241 7 Cir., 1972, cited by the majority, here we do not find anything like a licensee of the defendant with its principal place of business in Illinois whose agreement with the defendant contains provisions which control any aspects of the business activities of the licensee, with any significant measure of control over business activities within Illinois.

Section 17(1) (b) deals with jurisdiction over a non-resident in a cause of action arising from commission of a tortious act in Illinois. Jurisdiction over the first three counts dealing with allegations of trademark infringement in Illinois is based, in part at least, on § 17(1) (b). The majority does not reach plaintiff's assertion that there is a close nexus between those alleged tortious acts and the contract claim in Count IV. I believe, however, that a brief comment on that point is in order.

Section 17(3) limits jurisdiction based on § 17 only to causes of action arising from acts enumerated in § 17. The alleged breach occurred in 1969. The alleged tortious acts occurred in 1970.

I do not see that plaintiff's view is supported by the *qui tam* action for damages in Koplin v. Thomas, Haab & Botts, 1966, 73 Ill.App.2d 242, 219 N.E. 2d 646, where the Court found that the contracts of the nonresident broker defendant, who was registered in Illinois as a securities dealer, were more than minimal in selling "put and call" options in Illinois in alleged violation of Illinois prohibitions on gambling in securities. He had not only solicited business by advertisements in Illinois newspapers, but had conducted seminars in Illinois and knowingly done business with Illinois residents who made and paid for purchases as shown by defendant's reports to the Illinois Secretary of State. The Court held he was doing business in Illinois, invoking the benefits and protections of Illinois law. The Court further held that plaintiff's claim was one lying in the wake of the commercial activities by which defendant had submitted to the jurisdiction of Illinois Courts and that the cause of action arose from the consequences of the reported sales of put and call options, which allegedly violated the gambling statute, thus fulfilling the requirements of § 17(3).

In Consolidated Laboratories, Inc. v. Shandon Scientific Co., Ltd., 7 Cir., 1967, 384 F.2d 797, 801, the Court held that defendant's prior contracts with plaintiff as its exclusive United States distributor beginning in 1959 could be considered in determining jurisdiction over defendant on a claim based on a subsequent 1965 contract which was a modification of the 1963 contract and had been signed in Illinois. Plaintiff's claim was held to be in the wake of defendant's prior extensive Illinois business activity.

In Hutter Northern Trust v. Door County Chamber of Commerce, 7 Cir., 1968, 403 F.2d 481, 486, the Court also found Hutter's claims to be "in the wake of" the Chamber of Commerce activities in Illinois. .

Here, the alleged breach in 1969 could not have been a result, consequence, or in the wake of the acts in 1970.

Despite the considered opinion of my brothers, I am in complete accord with the District Court that the twice-yearly approximately three-day attendance at the Housewares Shows in 1967–1970, where no particular arrangements were made for meetings (although some customers and potential customers were notified that Mr. Sims-Hilditch would be there) and defendant had no booth or other display, no orders were ever received at a Show, (Mr. Sims-Hilditch testified he had no catalog or order blanks with him and that all orders had to be referred to defendant's Board of Directors for acceptance) did not constitute "doing business" in Illinois for purposes of § 17. Nor can I agree that discussions of competitors' sets, the latch design and the art work on packages at the January 1969 Show was sufficient to alter the position.

I hold the same view concerning the sales to which plaintiff refers. Mr. Sims-Hilditch visited Montgomery Ward in Chicago in the fall of 1966. Later, the London office of Montgomery Ward made contact with defendant and, in 1968, defendant began selling sets to Ward in quantities which have reached a total of about $800,000 worth. However, there is no written contract. All orders and payments have come from Ward's London office and the sets are shipped f. o. b. an English port to points outside Illinois, mainly Baltimore, Maryland, or Oakland, California. Payment was made in sterling f. o. b. London. Defendant buys the cords for its sets from Ward. They are manufactured by Ward's Beldon Company Division in North Carolina.

Similarly, Mr. Sims-Hilditch met a representative of A. F. Dormeyer Manufacturing Company, an Illinois Company, at a Show in 1968. No order was then received and Mr. Sims-Hilditch's recollection was that he did not even show samples. Two or more months later an order was received. To date, defendant has done about $250,000 worth of business with Dormeyer, all sets, however, being sent f. o. b. London. Mr. Sims-Hilditch has seen Dormeyer representatives at Shows and may have visited them.

As to the Harris bank account, no funds are or have ever been kept there. It was opened with permission of the Bank of England solely to convert dollars into pounds sterling.

I see no showing of substantial, systematic and continuous activity. Cf. Perkins v. Benguet Consolidated Mining Co., 1952, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485; Gordon v. International Telephone & Telegraph Corp., N.D., Ill., 1967, 273 F.Supp. 164, 168; Magnaflux Corporation v. Foerster, N.D., Ill., 1963, 223 F.Supp. 552, 562. Mere solicitation of business is not enough to make defendant amenable to process. Canvas Fabricators, Inc. v. William E. Hooper & Sons Co., 7 Cir., 1952, 199 F.2d 485, 487, citing Booz v. Texas and Pacific Railway Co., 1911, 250 Ill. 376, 95 N.E. 460, also cited with approval as Illinois law in Lindley v. St. Louis-San Francisco Railway Company, 7 Cir., 1968, 407 F.2d 639, 641–642, rehrg. den. 1969.

In Hertz Corporation v. Taylor, 1959, 15 Ill.2d 552, 155 N.E.2d 610, on which plaintiff relies, service was made on a non-resident corporation, Alcoa Steamship Company, Inc., which maintained a Chicago office, in which Illinois residents were employed under supervision of a Western Traffic Manager, from which it solicited freight and passenger business and sold tickets for transport on ships.

I cannot see such minimal contacts here as will bring Count IV within the scope of § 17.

With reference to the assertion of pendent jurisdiction, which the majority does not reach, I have carefully examined the claims in the four counts and agree with defendant that the claim in Count IV shows no common nucleus of operative fact with the claims of the other three counts. The facts to be proved in support of the infringement claims would not pertain to the breach of contract claim in Count IV. There is

no overlapping proof as in cases cited by plaintiffs, such as Robinson & Sons, Inc. v. Mister Donut of America, Inc., D. Mass., 1967, 270 F.Supp. 99, 100, or General Foods Corp. v. Struthers Scientific & Intl. Corp., D.Del., 1969, 297 F. Supp. 271, 277. While plaintiff describes the infringement as itself a breach of the contract, no claim is based thereon.

Pendent jurisdiction is a doctrine of discretion and not of right as noted in General Foods Corp. v. Struthers Scientific & Intl. Corp., *supra*, p. 275. In exercising his discretion, the District Judge may also have considered the fact that a part of plaintiff's contract claim is the subject of an action in England. The infringement claims at this time have been disposed of. I cannot see any abuse of discretion in a decision not to exercise pendent jurisdiction in this case even assuming it existed. Both parties here are non-residents. The witnesses will also be non-residents, and all documents are located outside Illinois. The cause of action arises from no conduct in Illinois. There is surely no "policy" reason for asserting Illinois jurisdiction here, as plaintiff argues.

Further, subsection (3) of § 17 by its terms protects non-resident defendants from assertion of causes of action not within its limitations by plaintiffs who have obtained jurisdiction over those non-resident defendants under subsection (1). The Official Joint Committee comments (Smith-Hurd Ill.Anno.Stat. p. 163 following § 17) support that interpretation. See also Historical & Practice Notes pp. 177–178, which note that subsection (3) prohibits joinder of an action not arising from the "minimum contacts" of subsection (1) with an action which does so arise. Jurisdiction here was obtained through § 17. It cannot be extended contrary to the provisions of § 17 itself.

Nor can I agree that United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, on which plaintiff relies, where the Court found (p. 725, 86 S.Ct. 1130) that the entire action comprised but one "case", authorizes extension of pendent jurisdiction beyond the limits of § 17 which has been relied upon to obtain jurisdiction over this defendant.

After careful review of all points and authorities cited in the light of plaintiff's arguments, and the majority opinion, I am still left with the conclusion that the decision of the District Court should be affirmed.