David **NEIMAN d/b/a London Group (1974), Plaintiff-Appellant,**

v.

**RUDOLF WOLFF & CO., LTD., James Gourlay and Ingleram Investments, Ltd., Defendants-Appellees.**

**Nos. 79–1622, 79–1802.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1980.

Decided April 23, 1980.

Rehearing and Rehearing En Banc Denied May 22, 1980.

William J. Harte, Chicago, Ill., for plaintiff-appellant.

Elliott Paskoff, New York City, Theodore J. Low, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, SPRECHER, and TONE, Circuit Judges.

TONE, Circuit Judge.

This is a diversity action asserting claims arising out of silver transactions on the London Silver Market. Jurisdiction over the person of the defendants is asserted under the Illinois long-arm statute, Ill.Rev. Stat., ch. 110, § 17, applicable by virtue of Rule 4(e), Fed.R.Civ.P. Based on depositions, documents, and affidavits, the court dismissed the action for lack of jurisdiction, holding that the defendants' contacts with Illinois were insufficient to subject them to that state's jurisdiction. We reverse that decision with respect to two defendants.

Plaintiff David Neiman is a citizen of Illinois. Defendant Rudolf Wolff and Company, Ltd., is a United Kingdom corporation with its office in London. Defendant James Gourlay is a British citizen.

Wolff is in the business of trading in metals, including silver. It acts as broker and principal in transactions on the London Silver Market. It has had no connection with Illinois other than the events described below.

Gourlay, who lives and works in London, was formerly employed by Wolff and later was engaged in the business of advising and counseling with respect to metal trading. For purposes of the present appeal, the parties stipulate that Gourlay was acting as Wolff's agent with respect to the events involved in this case.

Plaintiff withdrew its claim against a third defendant, Ingleram Investments, Ltd., during oral argument in this court.

■ Because the district court has decided the defendants' motion solely on the basis of written materials, Neiman need only show a prima facie case for personal jurisdiction. *O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971); *Data Disc, Inc. v. Systems Technology Associates Inc.*, 557 F.2d 1280, 1285 & nn.1 & 2 (9th Cir. 1977). In addition, Neiman is entitled not only to the acceptance of all undenied factual assertions in his submissions, but also to the resolution in his favor of all disputes about relevant facts. *United States Railway Equipment Co. v. Port Huron & Detroit Railroad*, 495 F.2d 1127, 1128 (7th Cir. 1974); *O'Hare International Bank v. Hampton, supra*, 437 F.2d at 1176.

Some time in late 1973 or early 1974 Gourlay visited Chicago and called on William E. Casselman, a commodities broker, whom Gourlay had known in a prior business relationship. Casselman was with a Chicago firm called ACLI. After Casselman had asked Gourlay, whom he had not seen in a few years, what he was doing and Gourlay had responded that he was "working on a tax shelter program," Gourlay went on to say, according to Casselman's deposition testimony, "[W]e have devised a method of getting an interest deduction that looks . . . like it's a feasible situation." Gourlay explained the tax shelter program to Casselman and two or three of the latter's business associates in the ACLI firm.[1] The device around which the program was built was known as a "cash-and-carry" transaction and was later explained by Gourlay in an affidavit filed in this case as follows:

> A "cash-and-carry" transaction is a straddle in which one purchases a quantity of silver for immediate delivery; the purchase price is wholly financed by a third party financier in a nonrecourse loan secured by the purchased silver and repaid with the proceeds of the sale of that silver on the due date of the loan; and, the buyer at the time of the purchase immediately sells the silver for delivery on the loan's due date.

Casselman understood Gourlay to say that he contemplated that the cash-and-carry transactions he had in mind would be carried out through Wolff. According to Casselman, Gourlay also said that he and an associate had arranged financing for the transactions with I. Rochester, a Swiss banking firm. Thereafter, Casselman stated, he had several telephone conversations with Gourlay about the tax shelter program in which Gourlay supplied additional information.

During 1974 Casselman placed orders for various customers that resulted in approximately twenty-five cash-and-carry transactions. All were handled through Gourlay with Wolff, some were financed by I. Rochester, and some were actively solicited by Casselman. Marshall Persky, another ACLI broker to whom, according to Casselman, Gourlay explained the cash-and-carry transactions during his visit to Chicago, testified by way of deposition that he entered into cash-and-carry transactions through Gourlay in late 1973, 1974, and 1975.[2]

In the summer of 1974 David Neiman approached Casselman to discuss the possibility of using silver trading as a tax shelter. Casselman told Neiman about the device Gourlay had worked out and answered many questions asked by Neiman about that device. Casselman also said that Gourlay was planning to be in Chicago in the fall of 1974 and could meet with Neiman. Neiman asked Casselman to arrange a meeting. Some time thereafter, and before the luncheon meeting that was ultimately held, Casselman gave Neiman a copy of the form of loan agreement used for the I. Rochester financing.

The luncheon meeting between Neiman, Gourlay, and Casselman was arranged for October 14, 1974, during a visit Gourlay was making to Chicago for other reasons. The accounts of the meeting presented in the depositions of Neiman and Casselman and the affidavit of Gourlay vary significantly. Neiman testified that in addition to asking many questions about the tax shelter de-

---

1. Casselman testified that Gourlay also explained the tax shelter to Marshall Persky and probably to Joseph Klein at ACLI during that visit. Both Persky and Klein denied discussing any business with Gourlay in Chicago at that time. Persky did testify, however, that he learned of cash-and-carry silver from Casselman about the time of Gourlay's visit and that he placed orders with Gourlay, presumably for customers, in late 1973, 1974, and 1975. Klein, who first met Gourlay in London in 1969, also testified to having conducted six cash-and-

carry transactions at some point during this time period, but did not say that he learned of the shelter through either Gourlay or Casselman. As we have said, factual disputes are resolved in favor of Neiman.

2. As stated in note 1, Persky denied discussing any business with Gourlay in Chicago at that time, but testified that he learned of cash-and-carry silver from Casselman about the time of Gourlay's visit.

vice, silver trading, the Wolff firm, and Gourlay's relationship to Wolff, Neiman discussed with Gourlay the I. Rochester loan agreement form and asked for two specific changes on the form, which Gourlay said could be made.[3] Neiman also testified that he and Gourlay discussed Wolff's commission rate, Neiman asking that it be reduced and Gourlay stating that it could not be reduced. Neiman concedes that no specific amounts of silver purchases were discussed but asserts that he did tell Gourlay that he would place substantial orders if the transactions could be handled as Gourlay had outlined.

Neiman also testified that after lunch, while he and Gourlay were sharing a taxicab, he told Gourlay that if the changes he wanted in the I. Rochester form of loan agreement were made, Neiman "thought we had a very large thing going."

Gourlay's version of the meeting, as stated in his affidavit, was that he explained the cash-and-carry transaction and "pointed out to Neiman that its attractiveness would depend on his individual financial and tax circumstances, and suggested that the situation could only be evaluated by him and his tax and financial advisers." Gourlay states that no proposals were made by any of the parties.

The version Casselman gave in his deposition was that Neiman asked many questions about the tax shelter device and silver trading. He could not recall any discussion about the loan agreement form or the nature of the Wolff firm and its business. Casselman testified that Gourlay did not solicit business from Neiman but merely answered his questions.

In November 1974 Neiman, in the name of "the London Group," placed four orders for cash-and-carry transactions with Gourlay. The orders were placed through Casselman, who by then had moved to Florida. During the next few months Neiman placed three more orders directly with Gourlay on behalf of the London Group. As a result of these orders seven cash-and-carry transac-

tions were concluded on the London Silver Market for the purchase and sale for future delivery of a total of 16,601,000 ounces of silver. All the transactions were handled by Wolff and financed by I. Rochester in the manner Gourlay had described in his conversations with Casselman and his associates and in his conversation of October 14, 1974 with Casselman and Neiman. The purchases were confirmed by written confirmation notices sent by Wolff to Neiman. These are the transactions out of which the claims in suit arise.

Neiman has also presented evidence that Wolff, through Gourlay, had other contacts with Illinois during this period. Specifically, Ronald Richter testified by way of deposition about two meetings with Gourlay in Chicago, in October, 1974 and October, 1975. At these two meetings, each of which lasted less than an hour, Richter and Gourlay concluded cash-and-carry transactions involving $49 million worth of silver and option contracts for silver worth hundreds of millions of dollars. The terms of the cash-and-carry transactions had been worked out prior to the meeting, but Gourlay wanted to meet Richter and persons who knew Richter before concluding the transactions. In addition, smaller details were settled and the terms were perhaps clarified. Richter had only casually mentioned option contracts over the telephone prior to the meetings. Gourlay then successfully solicited Richter's business during their meetings.

Neiman's amended complaint alleges claims for breach of contract against Wolff and Gourlay and an alternative claim for breach of warranty of authority against Gourlay. Also alleged is a claim against both defendants for what is designated as "common law fraud" but is later described as a conspiracy "to deprive Neiman of the benefits of his contracts with Wolff." We consider first the issue of jurisdiction over the claims sounding in contract.

**I.**

Plaintiff's argument that, by reason of the events described above, Gourlay and

---

**3.** Neiman also testified that Casselman's stated reason for proposing to Neiman that he meet

with Gourlay was to work out differences in the I. Rochester loan agreement form.

Wolff were doing business in Illinois in 1974 in the traditional sense, requires little discussion. Mere occasional solicitation does not subject a defendant to the state's jurisdiction generally, i. e., as to claims not arising from the solicitation. *Lindley v. St. Louis-San Francisco Ry.*, 407 F.2d 639, 642–43 (7th Cir. 1968); *Scheidt v. Young*, 389 F.2d 58 (3d Cir. 1968); *Long v. Victor Products Corp.*, 297 F.2d 577 (8th Cir. 1961). Nor do isolated, sporadic transactions with residents of the forum state. *See Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 189 (5th Cir. 1978). Nor does the acceptance elsewhere of orders resulting from the solicitation, which necessarily includes mailing confirmations into the state. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998–99 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Accordingly, the assertion of personal jurisdiction over Gourlay and Wolff must rest on the Illinois long-arm statute, § 17 of the Illinois Civil Practice Act.

II.

■ We hold that personal jurisdiction exists with respect to the contract claims under § 17(1)(a), which confers jurisdiction over a cause of action arising from "[t]he transaction of any business within this State." First, the Illinois courts have applied the quoted provision to sustain jurisdiction in circumstances analogous to those at bar. In *Kropp Forge Co. v. Jawitz*, 37 Ill.App.2d 475, 186 N.E.2d 76 (1962), defendant, after extensive negotiations by telephone, traveled to plaintiff's premises in Illinois for a quick inspection of the machinery to be sold. This was held sufficient for jurisdiction as "activity in furtherance of" the contract by the defendant in Illinois.[4] *See also United Air Lines, Inc. v. Conductron Corp.*, 69 Ill.App.3d 847, 26 Ill.Dec. 344, 387 N.E.2d 1272 (1979). *Compare Koplin v. Thomas, Haab & Botts*, 73 Ill.App.2d 242, 219 N.E.2d 646 (1966) *with Koplin v. Saul Lerner Co.*, 52 Ill.App.2d 97, 201 N.E.2d 763 (1964). In fact, since § 17(1)(a) reaches as

far as federal due process allows, its scope "is measured by federal standards." *Fissons, Ltd. v. United States*, 458 F.2d 1241, 1250 (7th Cir. 1972), *cert. denied*, 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 581 (1972); *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596, 598–99 (7th Cir. 1979), *cert. denied* —— U.S. ——, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980).

In our opinion, the foregoing activities of Gourlay in Illinois satisfy the due process requirement, as stated in *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *See also World-Wide Volkswagen Corp. v. Woodson*, —— U.S. ——, ——, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Lakeside Bridge & Steel Co. v. Mountain State Construction Co., supra.* The defendants here, unlike the defendant in *Lakeside*, 597 F.2d at 601, themselves conducted activities within the forum state. Whether these activities make exercise of personal jurisdiction reasonable is, therefore, the focus of our inquiry.

If we credit Neiman's version of the October 14, 1974 luncheon meeting with Casselman and Gourlay, as we must for present purposes, that meeting was a significant contact by the defendants with Illinois. Although this conversation, even by Neiman's own testimony, did not constitute the entire dealings between the parties or the entry into a completed contract, neither of these results is necessary to satisfy the requirements of due process. The conversation did constitute the bulk of the parties' negotiations about terms of the arrangement. A defendant's participation in the state in substantial preliminary negotiations leading to the contract in issue has been held* a sufficient basis for long-arm jurisdiction, *National Gas Appliance Corp. v. AB Electrolux*, 270 F.2d 472 (7th Cir. 1959), *cert. denied*, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d

---

**4.** This alternative holding is to be accorded precedential weight. *See Woods v. Interstate*

*Realty Co.*, 337 U.S. 535, 537, 69 S.Ct. 1235, 1236, 93 L.Ed. 1524 (1949).

542 (1960), even under New York's long-arm statute, which does not extend as far as due process allows, *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951 (2d Cir. 1967). Although this luncheon meeting was not as prolonged a negotiation as those in *National Gas Appliance* and *Liquid Carriers*, a defendant's participation in one or two brief meetings in the forum state has been held sufficient for the exercise of personal jurisdiction when significant negotiation of important terms of the transaction occurs.[5] Since, according to Neiman's version of the luncheon meeting, the discussion resulted in agreement on important terms of the arrangement, this contact with Illinois was very significant.

Even if we credit Gourlay's version of the luncheon meeting, his conduct amounted to circumspect solicitation of business from Neiman. Gourlay, by his own account, conferred with Neiman at the October 14 meeting about cash-and-carry silver transactions Neiman proposed to make. Gourlay explained the transactions to Neiman with a view to interesting Neiman in engaging in the transactions, although cautioning him

to do so only if they would suit Neiman's tax and financial objectives.

Whichever version we credit, when the luncheon meeting is considered with Gourlay's solicitation of Casselman and other ACLI brokers in late 1973 or early 1974, Gourlay's conduct in Illinois was sufficient to permit the district court to exercise personal jurisdiction over Gourlay and his principal, Wolff. Gourlay's statements to the brokers when he called on Casselman at ACLI were plainly aimed at interesting them in securing investors in silver transactions on the London Silver Market from which he and Wolff would make a profit. His statements to Neiman had the same purpose. This purpose was achieved: numerous transactions were entered into, among them the seven Neiman transactions out of which the claims at bar arose. The efforts of Gourlay to obtain orders through brokers in Illinois from customers generally, and not merely from Neiman, and the resulting orders placed by brokers for customers other than Neiman are relevant to the due process issue under the Supreme Court's analysis in a tort context in *World-Wide Volkswagen, supra.*[6] The Neiman

---

**5.** *See Moser v. Boatman*, 392 F.Supp. 270, 274 (E.D.N.Y.1975) (personal jurisdiction existed where defendants, in two short meetings in forum state, "were actively involved in at least preliminary . . . contractual negotiations in [forum state] where agreement on at least a number of the essential terms was apparently reached."); *Mendelson v. Fleischmann*, 386 F.Supp. 436 (S.D.N.Y.1973); *ECC Corp. v. Slater Elec., Inc.*, 336 F.Supp. 148 (E.D.N.Y.1971). *But see Viers v. Mounts*, 466 F.Supp. 187, 191 (W.D.Va.1979).

When a meeting in the forum state has been viewed as an insignificant portion of the negotiations concerning only minor details of the agreement, however, it has been held not to be sufficient to give a court personal jurisdiction over a defendant. *See National Spinning Co. v. Talent Network, Inc.*, 481 F.Supp. 1243 (S.D.N.Y.1979); *Luxury Air Service, Inc. v. Cessna Aircraft Co.*, 78 F.R.D. 410 (N.D.Ga.1978); *Verner v. Moran Towing & Transp. Co.*, 258 F.Supp. 169 (S.D.N.Y.1966).

**6.** *See Hardy v. Pioneer Parachute Co.*, 531 F.2d 193, 195 (4th Cir. 1976) ("No unconstitutional burden is imposed on a foreign corporation by requiring it to defend a suit in a forum located in a state where it has advertised and sold a product whose use gave rise to the cause of

action."); *Stephenson v. Jordan Volkswagen, Inc.*, 428 F.Supp. 195 (W.D.N.C.1977). Perhaps going a bit further is *Restatement (Second) of Conflict of Laws* § 36, Comment e (1971) (§ 36 is provision for individual defendants parallel to § 49 for nonresident corporate defendants, which is applicable here):

It is . . . reasonable that a state should exercise judicial jurisdiction over a foreign [corporation] as to causes of action arising from an act done . . . in the state for pecuniary profit and having substantial consequences there even though the act is an isolated act not constituting the doing of business in the state.

*See also Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 891 (1st Cir. 1977) (Coffin, C. J.) ("After *McGee* [*v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)] it seems fair to say that one who solicits in a state may be sued there if the transaction he has sought goes sour."); *Sahatjian v. Woodlets, Inc.*, 466 F.Supp. 945 (D.Mass.1979); *cf. also Peebles v. Murray*, 411 F.Supp. 1174, 1178 (D.Kan.1976) (transaction of business for purposes of long-arm statute occurs "when an individual is within or enters this state in person or by agent and, through dealing with another within the state, effectuates or attempts

transactions were "not simply . . . isolated occurrence[s], but [arose] from the efforts of [Wolff] to serve, directly or indirectly, the market for its product in other States." 100 S.Ct. at 567. Moreover, Neiman's orders themselves cannot be regarded as a casual, fortuitous result of Gourlay's two trips to Illinois.[7] Neiman placed the orders through Gourlay with Wolff as a result of Gourlay's activities in Illinois. Those activities were an important factor in the formation of the contracts out of which plaintiff's contract claim arises.[8] Accordingly, Gourlay's activities in Illinois were substantial enough and important enough to the subject matter of the action to satisfy the minimum contacts requirement of due process.[9]

### III.

Plaintiff alternatively asserts a tort claim labeled as common-law fraud but described as a conspiracy between Gourlay and Wolff "to deprive Neiman of the benefits of his

to effectuate a purpose to improve his economic conditions and satisfy his desires.").

7. Thus, this case is unlike *Kaye-Martin v. Brooks*, 267 F.2d 394 (7th Cir.), *cert. denied*, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959). *See Scovill Mfg. Co. v. Dateline Elec. Co.*, 461 F.2d 897, 900 (7th Cir. 1972).

8. The interest of the forum state and convenience, two factors not explicitly discussed in text, are often considered as part of a due process minimum contacts analysis. *See Aftanase v. Economy Baler Co.*, 343 F.2d 187, 197 (8th Cir. 1965); *Restatement (Second) of Conflict of Laws* § 36, Comment e (1971) (§ 36 is parallel to § 49, which is applicable here). However, these have been viewed as secondary factors. *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450, 456 n.10 (8th Cir. 1977). In the case at bar the former, which depends upon the relation of the plaintiff to the forum state, favors the exercise of jurisdiction here since Neiman is an Illinois resident. Although it may be inconvenient for defendants, an English corporation and citizen, to defend in Illinois, it would also be inconvenient for plaintiff to sue overseas. Given defendants' purposeful acts in Illinois, we do not find any inconvenience to amount to a denial of due process.

Similarly, even though the fact that forum state law is to govern a contract is often viewed as a factor favoring personal jurisdiction, we do not find that the fact that these sales were, according to the conditions printed on the reverse side of the confirmation notices, apparently to be governed by the rules and regulations of the London Silver Market requires us to deny personal jurisdiction.

9. *See Scovill Mfg. Co. v. Dateline Elec. Co.*, 461 F.2d 897 (7th Cir. 1972) (in contract action, personal jurisdiction existed over defendant-seller, where defendant started attending semiannual trade show in forum state in 1967, where discussions on sale began at July 1968 show, where negotiations elsewhere completed the contract, and where further discussions about details of production occurred at January 1969 and July 1969 trade shows). *See also*

*Bastille Properties, Inc. v. Hometels of America, Inc.*, 476 F.Supp. 175, 176–77 (S.D.N.Y. 1979); *American Contract Designers, Inc. v. Cliffside, Inc.*, 458 F.Supp. 735 (S.D.N.Y.1978); *Xedit Corp. v. Harvel Industries Corp.*, Fidelipac, 456 F.Supp. 725, 727–28 (S.D.N.Y.1978); *Northwest Animal Hospital, Inc. v. Earnhardt*, 444 F.Supp. 10 (W.D.Okl.1977); *Fieldcrest Mills, Inc. v. Mohasco Corp.*, 442 F.Supp. 424 (M.D.N.C.1977); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 374 F.Supp. 184 (D.Del.1974); *H. K. Corp. v. Lauter*, 336 F.Supp. 79 (N.D.Ga. 1971).

This case is distinguishable from *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 999–1000 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). The main difference between *Bersch* and the case at bar is that Neiman's orders were the purposeful objective of both Gourlay's earlier visit to Casselman and his luncheon meeting with Neiman. In *Bersch*, no connection was shown between the earlier solicitation trip and the later grant of the IOS Canadian underwriting to Crang. Also, at least the first breakfast meeting was not set with the IOS underwriting in mind. In addition, the New York long-arm statute, unlike that of Illinois, does not reach to the full extent permitted by constitutional due process. *Compare Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1966), *with Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 557, 21 Ill.Dec. 888, 892, 382 N.E.2d 252, 256 (1978), *cert. denied*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979) (quoting *Nelson v. Miller*, 11 Ill.2d 378, 389, 143 N.E.2d 673, 679 (1957)).

Defendants also urge that we follow *Wessel Co. v. Yoffee & Beitman Management Corp.*, 457 F.Supp. 939, 941 (N.D.Ill.1978), and find that the facts here constitute not "the transaction of business in Illinois [but] the transaction of business with an Illinois [resident]." *Wessel Co.* is clearly distinguishable, however, since the only contacts defendant had with Illinois were interstate phone calls and mail concerning the transaction at issue.

contracts with Wolff." Whether the tort claim is treated as a fraud claim or as a redundant claim for inducing breach of contract, no facts have been pleaded or shown elsewhere to support the claim or jurisdiction over it. The order of dismissal is affirmed with respect to the tort claim, without prejudice to plaintiff's right to seek to amend the pleadings to conform to the proof if evidence adduced later shows the existence of a claim in tort as to which defendants are subject to Illinois long-arm jurisdiction.

The judgment is affirmed with respect to the tort claim and reversed with respect to claims sounding in contract as to defendants Gourlay and Wolff, and the case is remanded for further proceedings consistent with this opinion. The judgment is affirmed as to defendant Ingleram. Plaintiff shall recover one-half of its costs against Gourlay and Wolff. Ingleram shall recover its costs against plaintiff.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.