**WAUKESHA CUTTING TOOLS, INC., Plaintiff,**

v.

**NEW JERSEY LIFE INSURANCE COMPANY, Defendant & Third Party Plaintiff,**

v.

**The STAMM AGENCY, INC., Third Party Defendant.**

Civ. A. No. 82–C–5.

United States District Court,
E.D. Wisconsin.

May 6, 1983.

Thomas J. Arenz, Stephen P. Juech, Milwaukee, Wis., for third party defendant.

Peter J. Stone, Milwaukee, Wis., for plaintiff.

Timothy J. Strattner, Brookfield, Wis., and Laurence B. Orloff, Newark, N.J., for defendant & third party plaintiff.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is a diversity action to recover damages arising from an alleged breach of contract. The defendant, New Jersey Life Insurance Company (NJL), has moved for summary judgment pursuant to Fed.R. Civ.P. 56. The Stamm Agency (Stamm), the third party defendant, has moved to dismiss under Fed.R.Civ.P. 4(d) and 12(b) for insufficiency of process and lack of personal jurisdiction. The material facts will be set forth first, with a discussion of each motion to follow.

Waukesha Cutting Tools, Inc. (Waukesha) is a Wisconsin corporation which, in the spring of 1981, sought to obtain life insurance on the life of Robert C. Brumder, one of its executive employees. Brumder was 64 and had a medical problem. Waukesha enlisted the services of KTM Associates, Inc. (KTM), a Wisconsin insurance agency, to investigate the availability of insurance on Brumder's life. KTM, on behalf of Waukesha, approached Stamm to explore available options and to obtain competitive quotations. Stamm is a Florida corporation which specializes in placing insurance for sub-standard risks.

First, KTM sent Stamm an "Insurability Inquiry" dated March 11, 1981 applying for insurance in the amount of $1 million and authorizing Stamm to obtain a statement from Mr. Brumder's attending physician. Stamm then obtained such a statement and forwarded it with the Inquiry on April 2, 1981 to NJL and other life insurance companies, requesting a "tentative offer." NJL is a Delaware corporation licensed to do business in Wisconsin as a non-domestic insurer; its principal place of business is in New Jersey.

NJL responded by sending Stamm a "Tentative Quotation" dated April 7, 1981. NJL quoted a policy in the amount of $1 million at standard table rates, which quotation was made subject to submission of the following items: "Formal Application," "Medical Examination," "Home Office [Urine] Specimen", "Chest X-Ray," "Masters Exercise ECG," "SMA-12 With Triglycerides" (a type of blood study), and an "Inspection Report." The quotation was signed by Richard Riker, NJL's vice-president in charge of underwriting. Stamm, acting as a general agent for NJL pursuant to a written "General Agent's Agreement" dated April 1, 1981, forwarded this quotation to KTM with a cover letter dated April 17, 1981. In the letter, Stamm calculated the standard premium rate based on Brumder's age to be $44.05 per $1,000 of coverage. The letter also requested submission of the pertinent medical information along with the policy application and premium, as "necessary application requirements."

Additional medical data were forwarded through KTM to Stamm on June 12, 1981. Because Waukesha was considering a competitive offer of insurance, KTM specifically asked Stamm on Waukesha's behalf "if the offer still stands from New Jersey based on the enclosed information." To keep its available options open, Waukesha intended first to submit the medical data to determine whether the standard rates still would be offered by NJL before sending the formal application and premium payment.

On June 15, 1981, Stamm sent the medical information to NJL, requesting NJL to "[p]lease confirm the standard rate as soon as possible as we are in competition on this case and need approval very soon." NJL responded to Stamm on June 17, 1981 with an "Underwriting Progress Report," signed again by Vice-President Riker, stating that "Standard still looks OK" and noting that two underwriting requirements remained due: the Inspection Report and Formal Application. A second progress report was sent to Stamm on June 25, 1981. It again stated that the inspection report and application were awaited, but said nothing as to the offer of standard table rates. In the final progress report, dated July 13, 1981, Mr. Riker indicated that only the formal application was being awaited and noted at the bottom of the report: "Still looks Standard."

In late July, 1981, Waukesha decided to pursue NJL's offer by completing the application and submitting a payment of the premium. At the bottom of Part I, the Formal Application states, *inter alia:*

It is understood that no one except the President, Vice President, Secretary, Assistant Secretary or Treasurer can make, alter or discharge contracts or waive any of the Company requirements.

It is agreed that: ... (2) that acceptance of the policy issued shall constitute a ratification of any addition, change or correction made by the Company and noted in the space entitled "corrections and amendments." ... (4) if the premium payment is made with this application, insurance shall become effective only as provided in the [Conditional Advance Premium] Receipt for such payment.

The Conditional Advance Premium Receipt provides in pertinent part:

IMPORTANT: This receipt does not provide any insurance unless and until each and every one of its conditions set forth in paragraph A below are met. No agent of the Company and no broker is authorized to alter, amend or waive any such conditions of this receipt.

\*    \*    \*    \*    \*    \*

A. CONDITIONS UNDER WHICH INSURANCE MAY BECOME EFFECTIVE PRIOR TO THE POLICY DELIVERY (For Up To 45 Days And $25,000)

If each and everyone of the following conditions are fulfilled exactly:

\* \* \* \* \* \*

3. the proposed insured . . . must be on the Effective Date, as defined below, a risk acceptable to the Company as a standard risk under the Company's rules, limits and standards for the plan and the amount of insurance applied for without modification and at the rate of the premium paid;

\* \* \* \* \* \*

"Effective Date" as used herein means the *latest* of the following dates: (a) the date of the application Part I; (b) the date of completion of all health statements, medical examinations, tests, X-rays and electrocardiograms required by published Company rules; or (c) the Policy Date, if any, requested in the application.

\* \* \* \* \* \*

C. RETURN OF PREMIUM RECEIVED

\* \* \* \* \* \*

If the Company declines the application or if no insurance becomes effective under the terms of this receipt, or if a policy is issued on a basis other than as applied for and such policy is not accepted, there shall be no liability on the part of the Company except to return the amount received . . . .

KTM and its principal, David J. Tolan, were in possession of both the application and the conditional receipt in late July, 1981, and knew of their provisions.

Waukesha sought to bind insurance coverage from the date the application and premium were tendered. Tolan of KTM had some doubt whether such a binder was contemplated in the Conditional Receipt; he also had concern that the offer of standard rates was based on stale medical data that might first have to be updated. Accordingly, Tolan telephoned Stamm on July 29 and July 30, 1981 to verify from NJL, first, whether NJL's offer was still open and, second, whether coverage would begin immediately upon Waukesha's tender of the application and premium. Specifically, he asked Stamm whether the Conditional Receipt was even applicable in this case when the underwriting decision to insure at standard rates had already been made. Tolan understood similar receipts to be employed customarily to bind limited coverage until the insurer had given its final approval to an underwriting of the risk. While Tolan admitted that some insurers refuse to bind coverage prior to final approval, "[t]his receipt was a little different."

Pursuant to Tolan's request, James Stamm, Jr. of the Stamm Agency, Inc. telephoned NJL on July 30, 1981. Stamm recalls speaking in Mr. Riker's absence to Salvatore Palermo, NJL's senior underwriter, who confirmed that the offer to insure at standard rates was still open without need for further medical information. Palermo has no recollection of the conversation; he does not remember any dealings with Stamm or any discussions with Riker regarding the Brumder case.

With regard to when coverage on the Brumder policy would become effective, Stamm tried to reach NJL President Paul Hanson, whom Stamm believed had authority on this question. According to Stamm, Hanson was unavailable and Stamm was referred to whom he believed was Hanson's assistant, Manual Lavin. Neither Palermo nor Lavin, however, was an officer of NJL. Stamm recalls being told by Lavin that coverage in the Brumder case would be effective from the time the premium and application was tendered. Lavin denies giving such assurances.

Mr. Stamm then telephoned Tolan of KTM and, pursuant to these conversations, represented that NJL had confirmed the standard rate offer and given its commitment to bind coverage immediately upon tender of premium and application. Later that day, July 30, 1981, KTM forwarded to

Stamm a check for one month's premium, a note for the balance, and a completed application. The next day Stamm received the materials and forwarded them by Federal Express to NJL with a transmittal letter requesting that the policy be dated July 30, 1981 and be issued immediately.

NJL placed Waukesha's premium check in a suspense account and sent the Brumder file to its re-insurer, NRG American Life Reassurance Corporation. Following an unfavorable evaluation of the risk by its re-insurer, NJL sent to Stamm a "Tentative Quotation" form dated August 5, 1981 informing Stamm that the premium deposit was being returned because "new information was received from an outside source which has caused us to temporarily withdraw our standard offer." On August 14, 1981, NJL sent Stamm a "Final Quote" for coverage under a $1 million policy at Table 4 premium rates, which are considerably higher than standard rates.

Waukesha did not accept the offer at Table 4 rates. Rather, Stamm placed the $1 million policy on Brumder's life with Transport Life Insurance Company at Table 2 rates, somewhat lower than NJL's Table 4 quote but at an annual cost of $9,220.00 above NJL's original premium quotation at standard rates. Waukesha has brought this action to recover not less than $367,200 in damages for NJL's breach of its agreement to insure Mr. Brumder's life at standard table rates.

I. NJL's Motion for Summary Judgment

Summary judgment under Fed.R.Civ.P. 56 is appropriate only when it is perfectly clear that there exists no genuine dispute either as to the material facts or as to conclusions to be drawn therefrom, and that on the basis of those evidentiary facts the moving party is entitled to judgment as a matter of law. The moving party carries the burden, and a heavy burden it is. In its assessment of the admissible evidence before it, the district court must accept the nonmoving party's version of all that is disputed and assume the credibility of his evidence. The nonmoving party likewise is entitled to have all internal conflicts resolved favorably to him, to have the most favorable inferences from the facts drawn in his behalf, and to be given the benefit of all favorable legal theories invoked by the evidence.

With these maxims in mind, NJL's motion for summary judgment will be denied.

The nature of the cause of action alleged by the plaintiff first must be clarified. Three kinds of contracts relating to insurance should be distinguished. A contract of insurance is "a contract by which one party, for a consideration, . . . promises to make a certain payment of money upon the destruction or injury of something in which the other party has an interest." It is "an undertaking by one party to protect the other party from loss arising from named risks, for the consideration and upon the terms and under the conditions recited." 1 Couch on Insurance § 1:2 (2d ed. 1959). Although the specific provisions of the agreement control, such contracts ordinarily are created upon preparation, execution, and delivery of the instrument as a binding obligation.

A second kind of contract of insurance often is used to afford the insured temporary coverage pending action upon the application and actual issuance of the policy. A binder or binding receipt is ordinarily the document which binds the insurer to provide temporary insurance pending an inquiry by the insurer into the character of the risk. See 1 Couch on Insurance § 14:26 (2d ed. 1959). These binding receipts may impose conditions on when the temporary insurance becomes effective, as in the instant case.

A third kind of contract relating to insurance is the contract to insure. It differs from the first two kinds in that it obligates the insurer not to pay money upon the happening of a stated contingency, but rather simply to issue a policy of insurance. In the case at bar, Waukesha seeks not to recover under an alleged contract for insurance because of the untimely demise of Mr. Brumder. The plaintiff is not contesting the effective date of a contract of insurance; Mr. Brumder did not die. Rather,

this action is predicated upon an alleged agreement by NJL to issue a $1 million policy on Brumder's life at "standard" rates. This contract to insure allegedly was breached when NJL withdrew its standard rate offer purportedly after it was accepted, and Waukesha sought to cover by securing alternative insurance at its own expense.

NJL asserts that the only possible foundation for such a contract lies in the representations made by Mr. Palermo and Mr. Lavin at NJL's offices to Waukesha through Stamm and KTM as agents. Palermo allegedly represented that Vice-President Riker's offer of standard rates was still open on July 30, 1981; Lavin purportedly represented on the same day that this offer was capable of being accepted by forwarding the application and premium payment, in effect confirming that the offer had ripened into a promise. The plaintiff having based its action on these representations, NJL argues that it is entitled to judgment as a matter of law on the basis of the following logic:

(1) the policy application and conditional receipt constitute the final and complete statement of the parties' agreement;

(2) the documents comprising the written contract in this case permit only certain corporate officers to enter agreements on behalf of the insurer;

(3) no officer of NJL issued final approval of the risk as one acceptable to NJL as a standard risk so as to render the tentative offer capable of unconditional acceptance;

(4) Mr. Palermo and Mr. Lavin, having no authority as a matter of law, could not bind NJL by their representations; and

(5) even if Palermo and Lavin could bind NJL as agents, their oral representations constitute inadmissible parol evidence of a contract to insure that varies the terms of the integrated contract of insurance.

■ The defendant's logic must fail in this case because it confuses issues of law with genuine issues of fact and it ignores two well-recognized exceptions to the parol evidence rule. I conclude that the oral representations of Salvatore Palermo, Manual Lavin, and the Stamm Agency are admissible for the purpose of determining, first, whether the parties intended the Formal Application and Conditional Advance Premium Receipt to be the final and complete expression of their understanding and, second, whether there existed an agreement to insure Mr. Brumder's life at standard rates, which agreement was intended to complete the understanding between the parties. The formal application allows for "corrections and amendments" thereto which the insured can ratify by accepting the policy, and the evidence as forecast by the documentary materials presently before the Court is sufficient to permit a jury to infer that NJL's agents had authority to make a parol contract to insure and to infer that such a contract in fact existed.

■ Having determined that the oral representations in this case are admissible, I also conclude that that parol evidence presents genuine issues of disputed fact. The central issue of fact is whether a parol contract to insure at standard rates was formed. To answer that question, the jury must determine, as an issue of fact, whether NJL's offer to insure at standard table rates was still open and capable of being unconditionally accepted on July 30, 1981 by completion of the application and payment of the premium. An additional subsidiary question of fact is whether the agents who made the oral representations to Waukesha had authority to do so. Summary judgment, therefore, is inappropriate in this case. NJL's motion is denied.

II. Stamm's Motion to Dismiss for Insufficiency of Service of Process and Want of Personal Jurisdiction.

The Stamm Agency, Inc. is a third party defendant in this action and has moved to dismiss NJL's third party complaint against it pursuant to Fed.R.Civ.P. 4(d) and 12(b)(2). As stated earlier, Stamm is a Florida corporation; it is not registered as a foreign corporation in Wisconsin; it maintains no office, no bank account, no post office boxes, and no telephone listings with-

in the state of Wisconsin. Stamm, although maintaining an "800" toll-free telephone number for the convenience of out-of-state customers, does not solicit business in Wisconsin and did not solicit KTM's contract in this case notwithstanding the fact that KTM regularly used the toll-free line to communicate with Stamm. Finally, no Stamm employee set foot in Wisconsin in connection with the transaction at issue in this case.

Stamm nevertheless served in a pivotal capacity in the negotiations between Waukesha and NJL leading to the alleged contract to insure. As NJL's general agent, Stamm acted as a conduit through which was funneled information and documents between NJL and Waukesha's Milwaukee agent, KTM. When Stamm communicated KTM, it was either by telephone or by letter from Florida.

Process was served on Stamm by leaving the Summons and Complaint with one Joanne Schlander, a receptionist for Multiple Life Companies, Inc., a Florida corporation. Before Schlander was served she was asked if James C. Stamm was present. When she responded that Mr. Stamm was in a meeting but that an appointment could be made with him, the process server asked if any other officers of the Stamm Agency were present. Schlander said "no." She then was asked if she worked in the office; she answered "yes." Schlander thereupon was given the Summons and Complaint, and was advised that the Stamm Agency had been served. The process server did not ask whether she was an agent, employee or servant of Stamm.

■ Addressing first the challenge to the sufficiency of service, the Court finds that service of process on Stamm in this case complied with Fed.R.Civ.P. 4(d)(3). That rule authorizes service upon foreign corporations by delivering a copy of the summons and complaint to an agent authorized by law to receive service of process. Section 801.11(5)(a), Wis.Stats., correspondingly authorizes service upon foreign corporations by leaving a copy of the summons and complaint in the office of an officer, di-rector, or managing agent of the corporation with "the person who is apparently in charge of the office."

On the basis of the conversation between the process server and Joanne Schlander, as sworn to by the latter, I find that the summons and complaint were delivered to the office of a Stamm officer. The flavor of the conversation is strong enough to persuade me that "[Joanne Schlander] worked in the office [of Mr. James C. Stamm or some other officer of The Stamm Agency, Inc.]."

I further find that, from the flow of the conversation, it was reasonable for the process server to conclude that Joanne Schlander was apparently in charge of the office, even though the process server failed to inquire as to the position, responsibility, authority, or name of the served party. The precise identity and job title of the person served is not critical, and the facts as reported by Schlander do not render unsupportable the assumption that she indeed was "in charge of the office." *See Horrigan v. State Farm Insurance Co.,* 106 Wis.2d 675, 317 N.W.2d 474 (1982).

■ As further support for its motion to dismiss, Stamm asserts that this Court lacks personal jurisdiction over NJL's third party complaint. NJL bears the burden of demonstrating the existence of personal jurisdiction, but it need only show a prima facie case for such jurisdiction and is entitled to have all disputed factual assertions resolved in its favor. *See Neiman v. Rudolf Wolff & Co.,* 619 F.2d 1189, 1190 (7th Cir.1980).

To determine whether it has personal jurisdiction over the third party defendant, the Court should look to the relevant state jurisdictional statute. NJL has not made clear which provisions of Wisconsin's long-arm statute, Wis.Stats. § 801.05, it relies upon to sustain jurisdiction, but instead bases its argument upon the constitutional requirements of due process. Wisconsin's long-arm statute was intended to codify the due process requirements of "minimum contacts" set forth under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct.

154, 90 L.Ed. 95 (1945), so that compliance with the statute makes at least a *prima facie* case of compliance with constitutional requirements. For the purposes of Stamm's motion to dismiss, the Court will evaluate Stamm's relationship to the forum state against the constitutional standard of due process.

The focus of the due process requirements is on "traditional notions of fair play and substantial justice." "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158.

I conclude that Stamm's contacts with Wisconsin are sufficient to satisfy the "minimum contacts" test and that such contacts with the forum state make it reasonable and fair, in the context of our federal system, to require Stamm to defend NJL's third party complaint in Wisconsin.

Stamm contends with good reason that none of its employees came to Wisconsin in connection with the negotiation of the Brumder contract and that the only contacts it had with Wisconsin were an undetermined number of telephone calls and letters between KTM and Stamm. *Compare Nordberg Division of Rex Chainbelt, Inc. v. Hudson Engineering Corp.*, 361 F.Supp. 903, 907 (E.D.Wis.1973) *with Lakeside Bridge & Steel v. Mountain State Construction*, 597 F.2d 596 (7th Cir.1979) *and Capitol Indemnity Corp. v. Certain Lloyds Underwriters*, 487 F.Supp. 1115, 1120–21 (W.D.Wis.1980). Stamm further asserts that its motion seeks to dismiss the third party contract action filed against it by NJL, an out-of-state insurer. The precise issue presented here does not implicate Wisconsin's strong interest in providing its citizen policyholders with a forum. *Cf. McGee v. International Life Insurance*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

These considerations, although weighty, are not controlling in this case. Stamm, in this case, was in the position of an out-of-state seller of services. In return for bringing together the insured and the insurer, Stamm was paid a commission by NJL. As general agent for NJL, Stamm received an insurability inquiry from a Wisconsin company through its agent, KTM. Although Stamm did not solicit the business of KTM, Stamm played an active role in placing the $1 million Brumder policy. Stamm made certain critical representations during the contract negotiations and urged on KTM's behalf that NJL quickly consummate the arrangement.

I find that Stamm invaded the markets of Wisconsin to conduct its business and that Stamm's penetration of the forum state for economic advantage, even absent solicitation activities, subjects it to the jurisdiction of Wisconsin's courts in the circumstances of this case. Moreover, Wisconsin's interest in NJL's third party complaint is not insignificant. The state has an identifiable interest in discouraging overzealous out-of-state agents from penetrating local markets and carelessly making representations designed to facilitate the underwriting of risks located in the forum state. By enabling the Wisconsin policyholder or foreign insurer to sue the intermediary in the jurisdiction where the insurance contract was negotiated, the Court assists in fostering the state's interest.

It also should be noted that Stamm is more able to litigate claims in a foreign forum than are typical mail order consumers. I conclude that Stamm reasonably could have anticipated being sued in Wisconsin and that Wisconsin is a fair forum for this third party litigation. Stamm's motion to dismiss for insufficiency of service of process and for want of *in personam* jurisdiction is denied.

NOW, THEREFORE, IT IS ORDERED that the motion for summary judgment filed by defendant New Jersey Life Insurance Co. pursuant to Fed.R.Civ.P. 56 is denied.

IT IS FURTHER ORDERED that the motion to dismiss filed by third party defendant, The Stamm Agency, Inc., pursuant to Fed.R.Civ.P. 4(d) and 12(b) is denied.