**TORCO OIL COMPANY, Plaintiff,**

v.

**INNOVATIVE THERMAL CORPORA-TION, John Rivera, and H. Jenks Caldwell, Defendants.**

**No. 88 C 7323.**

United States District Court,
N.D. Illinois, E.D.

Dec. 28, 1989.

---

Francis X. Grossi, Jr. and Karyn G. Gershon, Katten Muchin & Zavis, Chicago, Ill., for plaintiff.

Nicholas Rantis and James C. Reho, Law Offices of Nicholas S. Rantis, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Torco Oil Company (Torco) brings this action against defendants Innovative Thermal Corporation (ITC) and two of its officers, John Rivera and H. Jenks Caldwell, each 50% owners of ITC,[1] alleging breach of contract and fraud. Before this court is defendants' motion to dismiss the action based on lack of personal jurisdiction. For the reasons set forth below, the motion is granted in part and denied in part.

**FACTS**

In June 1988, Torco and ITC entered into a contract for the sale and purchase of natural gas. Under this contract ITC covenanted to deliver and Torco to purchase "all gas necessary to meet [Torco's] requirements for Natural Gas up to the volumes of gas as are set forth in the Nomination Notice." This nomination notice, appended to the contract, specified that a quantity of 25,000 mmbtu, or one million British Thermal Units, of gas per day for a year be supplied.[2] No gas was ever delivered under the contract and Torco brought this action seeking damages resulting from the breach.

Supplementing the breach of contract claim is Torco's allegation in its complaint that it was fraudulently induced to enter into the contract by false statements made by Rivera and Caldwell that represented ITC as "adequately capitalized and sound" and "experience[d] in the sale of natural gas" with "access to substantial reserves and supply." To convince Torco of ITC's financial legitimacy and secure their participation in the contemplated transaction, Torco claims, Rivera and Caldwell drew on the financial stability of Caldwell's other business concerns; in addition to his half-ownership interest in ITC, Caldwell owns various other entities, including Charlotte Aircraft Corporation, Charlotte Aerospace Company, and Caldwell Aircraft Trading Company.

ITC now moves to dismiss the counts against all three defendants based on lack of personal jurisdiction. The contacts between ITC and Illinois, it argues, fall short of the level needed to satisfy the Illinois long-arm statute. Even if these contacts are found to be sufficient, ITC continues, they cannot be attributed to Rivera and Caldwell to bring them as individuals within the ambit of Illinois jurisdiction, for the fiduciary shield doctrine, applicable here, according to ITC, serves to protect individ-

---

**1.** For clarity and simplicity, we will refer to the defendants collectively as "ITC," even when discussing the amenability of Rivera and Caldwell as individuals.

**2.** A British Thermal Unit is the quantity of heat required to raise the temperature of one pound of pure water from 59 Fahrenheit to 60 Fahrenheit at a certain constant pressure. Gas Purchase Agreement at 2.

uals from amenability to a state's jurisdiction where, as here, the only contacts with that state spring from their activities as representatives.

## DISCUSSION

To the extent the fiduciary shield doctrine does not apply, jurisdiction over Rivera and Caldwell may be proper on the basis of ITC's contacts with Illinois. Because jurisdiction over the individuals is in part derivative of the corporation's amenability, then, we consider first whether ITC is properly before this court.

I. *Amenability of Innovative Thermal Corporation to Illinois Jurisdiction*[3]

A federal district court sitting in diversity has personal jurisdiction over a party only if a state court of the forum in which the district court sits could exercise jurisdiction. *Turnock v. Cope*, 816 F.2d 332, 334 (7th Cir.1987). It is to Illinois law, therefore, that we turn in determining whether jurisdiction over defendant ITC is proper. In a motion to dismiss for lack of personal jurisdiction, the party asserting the existence of jurisdiction—the plaintiff—carries the burden to provide sufficient evidence to support jurisdiction. *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir.1971); *Caicos Petroleum Service Corp. v. Hunsaker*, 551 F.Supp. 152, 153 (N.D.Ill.1982); *Olinski v. Duce*, 155 Ill.App.3d 441, 443, 108 Ill.Dec. 237, 239, 508 N.E.2d 398, 400 (1987). A *prima facie* showing that jurisdiction over the defendant is proper will satisfy this burden. *O'Hare Int'l Bank; Ingersoll Milling Machine Co. v. J.E. Bernard & Co.*, 508 F.Supp. 907, 911 (N.D.Ill.1981). In deciding the motion, a court may receive and consider affidavits from both parties, *O'Hare Int'l Bank; Connolly v. Samuelson*, 613 F.Supp. 109, 100 (N.D.Ill.1985); *Caicos Petroleum*, 551 F.Supp. at 155, and all factual conflicts between the parties are to be resolved in favor of the plaintiff.

*Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir.1984); *Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1190 (7th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980); *Financial Management Services v. Sibilsky and Sibilsky*, 130 Ill.App.3d 826, 831, 86 Ill.Dec. 100, 105, 474 N.E.2d 1297, 1302.

A plaintiff may establish jurisdiction over a nonresident defendant in Illinois if it can make a *prima facie* case that the defendant has performed—and the cause of action arises from—one of the jurisdictional acts enumerated in the Illinois long-arm statute, Ill.Rev.Stat. ch. 110, ¶ 2–209 (1987), or is "doing business" in Illinois, *and* that jurisdiction over the defendant comports with the prescripts of due process. *See Deluxe*, 726 F.2d at 1212. Although these inquiries were deemed at one time to be coextensive, *see, e.g., Nelson v. Miller*, 11 Ill.2d 378, 389, 143 N.E.2d 673, 679 (1957), the Illinois Supreme Court recently liberated long-arm statute analysis from its dependence on due process decisions:

A statute worded in the way ours is should have a fixed meaning without regard to changing concepts of due process, except, of course, that an interpretation which renders the statute unconstitutional should be avoided, if possible.

*Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 436, 56 Ill.Dec. 657, 660, 427 N.E.2d 1203, 1206 (1981). *Green* thus mandates a bifurcated analysis, requiring a court to consider separately whether jurisdiction over a defendant complies with Illinois statutory requirements and due process standards.

A. Illinois Long–Arm Statute

Torco does not argue that ITC regularly "does business" in Illinois—nor could it, for ITC's business transactions, with the sole exception of its ill-fated contract with Torco, have been limited to activities outside of Illinois that have neither directly nor indirectly involved that state;[4] jurisdiction is

---

3. Rivera is treated as a representative of Innovative for the purpose of this first inquiry. When we turn to the question of the fiduciary shield doctrine below, we will determine whether this characterization is proper.

4. As of early November, 1988, Innovative had fully executed a contract only with Torco, Riv-

proper under a "doing business" theory "only when there is some regularity of activities in Illinois." *Connolly*, 613 F.Supp. at 111 (citing *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 202–03, 57 Ill.Dec. 730, 735–36, 429 N.E.2d 847, 852–53 (1981)). Our analysis, therefore, will focus on the Illinois long-arm statute and its applicability to the facts in the instant dispute.

The Illinois long-arm statute provides that a defendant submits to jurisdiction in Illinois if it engages in, *inter alia,*

(1) The transaction of any business within this State; [or]

(2) The commission of a tortious act within this State;

and the "cause of action aris[es] from the doing of ... such acts." Ill.Rev.Stat. ch. 110, ¶ 2–209 (1987). Although Torco includes a count of fraud in its first amended complaint, it does not pursue this count as a basis for jurisdiction, and therefore we limit our discussion to the "transaction of business" prong of the long-arm statute.

### 1. *Transaction of Business*

Distinct from the common law concept of "doing business," the "transaction of business" for .the purposes of the long-arm statute requires no regularity of in-state conduct; "[e]ven a single business transaction is sufficient to bring a foreign defendant within the purview of the statute provided that the cause of action arises from the Illinois transaction." *Convenient Food Mart v. De Florentis*, No. 86 C 1088, 1986 WL 14150 (N.D.Ill. Dec. 10, 1986) (cit-

ing *Empress Int'l, Ltd. v. Riverside Seafoods*, 112 Ill.App.3d 149, 67 Ill.Dec. 891, 892, 445 N.E.2d 371 (1983)).[5] The determination of whether a given transaction qualifies as an Illinois transaction involves a very fact-intensive inquiry that defies bright line rules, but some guiding principles have evolved, and certain factors are consistently invoked. Three factors in particular have figured prominently in transaction-of-business analysis in contract cases: who initiated the transaction, whether any significant act(s) in furtherance of the contract occurred in Illinois, and where the contract was to be performed. *See Caicos Petroleum*, 551 F.Supp. at 154; *Ideal Stencil Machine and Tape Co. v. Merchiori*, 600 F.Supp. 185, 189 (S.D.Ill.1985).

The identity of the party that makes the initial contact leading to the contract is considered a key factual inquiry, *see Caicos Petroleum*, 551 F.Supp. at 154; *Convenient Food Mart*, No. 86 C 1088, and has been cited in many cases. *See, e.g., O'Hare Int'l Bank*, 437 F.2d at 1176; *Welles Products Corp. v. Plad Equipment Co.*, 563 F.Supp. 446, 447 (N.D.Ill.1983). Where the defendant enters Illinois and actively solicits the business transaction there, courts have easily found the long-arm statute to have been satisfied. *See Maurice Sternberg, Inc. v. James*, 577 F.Supp. 882 (N.D.Ill.1984); *Caicos Petroleum*, 551 F.Supp. at 154. In *Caicos Petroleum*, we drew a distinction between the situation at issue there—the plaintiff initiating contact with the defendant outside of

---

era Dep. at 97, although it had pursued other business relations. *Id.* at 133–40. Additionally, it had entered into a joint venture agreement with Portagaz, an Oklahoma corporation.

**5.** Although chronologically a post-*Green* decision, *Empress* fails to acknowledge the distinction clearly delineated in *Green* between due process and statutory analysis. *See Empress*, 112 Ill.App.3d at 152, 67 Ill.Dec. at 892, 445 N.E.2d at 372. Considering the precedential value of pre-*Green* decisions (and *Empress* is functionally such a decision), Judge Brian Barnett Duff advocates a case-by-case approach:

Those pre-*Green* cases which tracked their analyses to the specific wording of the statute remain valid after *Green.* But in those cases where the courts merely stated that the Illi-

nois statute goes as far as due process will allow the precedential value today is minimal. *Rose v. Franchetti*, 713 F.Supp. 1203 (N.D.Ill. 1989). The *Empress* decision falls between the cracks: it quotes approvingly a passage from a pre-*Green* case stating that the Illinois long-arm statute confers jurisdiction to the extent permitted by due process, and yet it specifically invokes long-arm statutory language with respect to its transaction-of-business analysis. We find it significant that several later cases have cited *Empress, see, e.g., Convenient Food Mart*, No. 86 C 1088; *B.L. Marder v. Stoll & Hansen Co.*, 84 C 3090, 1985 WL 1533 (N.D.Ill. Feb. 4, 1985) (reading *Empress* as applying the long-arm statute although ignoring *Green* ), and do not consider it to have been "overruled" by *Green.*

Illinois—and the hypothetical situation of a defendant initiating contact in Illinois; jurisdiction was proper in the latter, we held, but not the former. *Caicos Petroleum* at 154–55. The two scenarios discussed in *Caicos Petroleum*, however, omit the possibility of the defendant contacting the plaintiff *outside* of Illinois. Where contact is made solely through telephone calls and mail communication, the fact that the defendant initiated contact is a significant, but not controlling, factor in determining whether personal jurisdiction is proper, *Leonardo's, Inc. v. Greathall, Ltd.*, 714 F.Supp. 949, 952 (N.D.Ill.1989); [6] a court will consider additionally where the contract was signed [7] and where performance was to take place and will balance these factors if they point in different directions. *Id.* at 952–53; *see also Ideal Stencil*, 600 F.Supp. at 189 (jurisdiction found where order initiated by defendant and received in Illinois); *U.S. Reduction Co. v. Amalgamet, Inc.*, 545 F.Supp. 401, 403 (N.D.Ill.1982) (no jurisdiction where telephone calls made to Illinois but contract was to be performed elsewhere).[8]

The second prominent factor on the transaction-of-business front—whether any activity in furtherance of the contract has occurred in Illinois—most often appears in the form of in-state negotiations. Where these negotiations are "of some substance" they clearly rise to the level of transaction of business in Illinois. *See Ronco, Inc. v. Plastics, Inc.*, 539 F.Supp. 391, 396 (N.D. Ill.1982); *First Nat'l Bank of Chicago v.*

*Boelcskevy*, 126 Ill.App.3d 271, 274, 81 Ill. Dec. 380, 383, 466 N.E.2d 1182, 1185 (1984). Precisely what is called for by the phrase, "of some substance," however, is less clear. One court has suggested that the relationship of the negotiations to the ultimate contract should comprise part of the substantiality test. In *Maurice Sternberg*, the court found the negotiations in Illinois to fall short of the threshold necessary to sustain jurisdiction where they did not lead directly to the contract upon which the suit at issue was based. *Maurice Sternberg, Inc. v. James*, 577 F.Supp. 882, 886 (N.D. Ill.1984). This test of substantiality, however, seems to draw on factors more appropriately considered as part of the "arising from" inquiry, *see infra*, and at any rate does not assist us in determining the *quantity* of negotiations needed to constitute transaction of business.

Negotiations have been found to be adequately substantial in a number of cases where they lead to the in-state signing of a contract. *See Jacobs/Kahan & Co. v. Marsh*, 740 F.2d 587, 590 (7th Cir.1984) ("partial" negotiations and signing in Illinois); *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 699 F.2d 909 (7th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 172 (1983). So too have negotiations resulting in legally binding changes. In *Ronco*, the parties held a meeting in Illinois at which "details of the transaction were laid out, and legally binding contractual changes were made."

---

**6.** Communication by mail or telephone alone has been held to be insufficient to support jurisdiction, *Connolly*, 613 F.Supp. at 111; *Caicos Petroleum*, 551 F.Supp. at 154, for the jurisdictional act of transacting business in Illinois is a distinct concept from merely transacting business with an Illinois corporation.

**7.** The *Leonardo's* court interpreted this factor to call for an inquiry into where the *plaintiff* entered into the contractual relationship, *see* 714 F.Supp. at 953; indeed, because these factors apply only to situations where no face-to-face contact between the parties occur, this interpretation must be correct.

**8.** In *Maurice Sternberg, Inc. v. James*, 577 F.Supp. 882, 885 (N.D.Ill.1984), however, the court suggested that defendant-initiated contact is irrelevant where the parties communicated solely by telephone and mail. Citing *U.S. Re-*

*duction*, the court asserted that phone calls and letters do not constitute the transaction of business "regardless of which party initiates the calls, correspondence or the transaction itself," *Maurice Sternberg* at 885, and proceeded to disregard this contact. This result, it seems, stems from an incomplete reading of *U.S. Reduction*. There, the court rejected the plaintiff's argument that the defendant-initiated contact via telephone was sufficient to confer jurisdiction, reasoning in part that in those cases where jurisdiction was found, additional factors (*e.g.* performance in Illinois) not present in the dispute at issue contributed to the finding of jurisdiction. *U.S. Reduction*, 545 F.Supp. at 403. We do not read this holding as denying that the identity of the initiator of contact may be significant, albeit not dispositive.

In rejecting the defendant's motion to dismiss, the court observed, "[i]f this [conduct] is not 'transacting business in Illinois,' it is difficult to imagine what is." *Ronco*, 539 F.Supp. at 396; *see also Neiman*, 619 F.2d at 1194 (brief meetings sufficient where "agreement on important terms of the arrangement" resulted).[9] Many courts, however, simply find the negotiations in Illinois to support jurisdiction without probing extensively the question of substantiality. *See, e.g., Convenient Food Mart*, No. 86 C 1088 (jurisdiction found where defendant "came to Illinois to meet with [defendant's] executives about obtaining" the object of the contract).[10]

Finally, courts have frequently looked to the place slated for contractual performance in making personal jurisdiction determinations. In fleshing out this consideration, we noted in *Caicos Petroleum* that the performance factor alone is sufficient to support jurisdiction where "the 'defendants knew or should have known that the completion of the agreement would be performed exclusively in Illinois.'" *Caicos Petroleum*, 551 F.Supp. at 155 (quoting *Artoe v. Mann*, 36 Ill.App.3d 204, 206, 343 N.E.2d 647, 649 (1976)).[11] Other courts

have found jurisdiction where products were shipped in substantial volume to Illinois under the terms of the contract. *Ronco*, 539 F.Supp. at 397 ("By shipping into Illinois, defendants knew that any defects in their performance would have consequences in Illinois. Shipping items into Illinois in substantial volume therefore suffices to constitute transacting business . . . .").

■ Applying the law to the facts in the instant dispute, and resolving all conflicts in favor of the plaintiff, we are persuaded that ITC's activities in Illinois rise to the level of "transaction of business." Albeit not in person, ITC, through Rivera, initiated contact with Torco by informing Wilkins, Torco's executive vice-president for gas marketing, that ITC had natural gas available for purchase and by proposing an offer for contractual relations (Verified Complaint ¶¶ 5, 7.)[12] While not dispositive, this factor is certainly relevant and must be weighed in favor of jurisdiction. Whether ITC's solicitation by telephone is sufficient to support jurisdiction, however, requires us to consider also where the contract was entered into and where performance of the contract was to take place.

9. *Neiman*, decided in 1980, explicitly incorporates the pre-*Green* view that the Illinois long-arm statute is meant to stretch to the limits of federal due process. 619 F.2d at 1193. However, its discussion of in-state negotiations remains valid even in a post-*Green* setting, for this analysis is conducted with reference to the New York long-arm statute, which "does not extend as far as due process allows." *Id.* at 1194.

10. One court failed to find jurisdiction where the in-state meeting took on a character of a presentation of the business proposal rather than actual negotiations, *Pathway Financial v. Heaton*, No. 86 C 9089, 1989 WL 49151 (N.D.Ill. Apr. 21, 1989), but the importance of this distinction is unclear because the court also emphasized that the significance of the meeting as a factor supporting jurisdiction was greatly diminished by the fact that the plaintiff in that case "'urged' [the defendant] to come to Illinois."

11. *Caicos* does not distinguish between significant performance by the plaintiff and by the defendant in Illinois. In *Maurice Sternberg*, however, the court suggested that it is where the *defendant* performs, rather than the plaintiff,

that is relevant in determining whether jurisdiction is proper. 577 F.Supp. at 885–86. The court there declined to uphold jurisdiction where the only performance in Illinois of contractual duties took the form of shipment of goods from Illinois by the plaintiff.

12. ITC points to Rivera's deposition in support of the position that Torco in fact initiated contact between the two parties. Rivera Dep. at 116. While recognizing the conflict on this issue, we are constrained to adopt Torco's version of the facts, verified on oath by Wilkins, as true for the purpose of deciding this motion Moreover, the straightforward contradiction of Torco's version that is contained in the passage of Rivera's deposition highlighted by ITC is somewhat undermined by a more muddied description earlier in the deposition of the beginning of Innovative's relationship with Torco:

It is fair to say that he [Wilkins] had about 15 people totally disassociated with me offering him my gas, and through joint efforts on his part and my part, to weed out all the middlemen, we mutually came together, he as buyer, me as supplier.

Rivera Dep. at 35.

Although signed in Illinois,[13] the contract did not provide for any significant performance to take place in that state,[14] and therefore this issue presents a tricky question of balancing. But because we find jurisdiction to be proper regardless of the outcome of this balancing test, it becomes unnecessary to attempt to weigh and resolve these conflicting factors.

It is the activity of Rivera in Illinois, in furtherance of the contract, that is the most significant jurisdictional fact and that supersedes all other considerations.[15] Rivera traveled to Illinois in July, 1988 for the exclusive purpose of meeting with Wilkins regarding the gas purchase agreement between ITC and Torco (Rivera Dep. at 64). At this meeting, Rivera discussed the transaction with Wilkins, going over the contract page-by-page (*id.* at 52, 60), and agreeing to binding changes (*id.* at 58–63). These negotiations resulted in a revised contract that was then signed by both parties (*id.* at 39, 51, 60). These facts parallel quite closely the facts in *Ronco*, and we echo that court's unequivocal characterization of this conduct as "transaction of business." It is irrelevant that the initial contract, the majority of which was incorporated in the amended contract signed in Chicago, was exchanged by way of facsimile machines. That a previous contact with the forum state (here the faxed transmission of the contract to Illinois for the plaintiff to sign) may not rise to the level of a jurisdictionally-cognizable contact, does not condemn a subsequent related

contact (the negotiations in Illinois). Were the order of these contacts reversed—and the *final* version had been faxed between the parties—the "arising from" inquiry might be more complicated, but even under those circumstances, Rivera's trip to Illinois would serve as sufficient transaction-of-business to take us to that next step.

Nor do we deem it significant that the contract contained a provision stipulating that the agreement would be governed by Oklahoma Law. Although a choice-of-law provision has been used in the affirmative to support a finding that the defendant invoked the benefits of the specified state, *O'Hare Int'l Bank*, 437 F.Supp. at 1177; *Pathway Financial*, No. 86 C 9089, it alone is insufficient to confer jurisdiction. *See Northern Trust Co. v. Randolph C. Dillon, Inc.*, 558 F.Supp. 1118 (N.D.Ill. 1983); *Tents, USA, Inc. v. Circus Arts Foundation*, No. 89 C 20011, 1989 WL 57788 (N.D.Ill., Apr. 20, 1989). Indeed, the concept of choice-of-law is distinct from consent to personal jurisdiction, and it is quite conceivable that a choice-of-law provision might be included in a contract for reasons wholly unrelated to jurisdiction concerns:

Parties to an agreement may elect to have a particular state's law govern the terms of an agreement for any number of reasons. For example, the commercial law of one jurisdiction may be incorporated merely as a contract "gap filler." While the parties may have expressed an intent to abide by the substantive law of

**13.** This issue is slightly complicated by the fact that two versions of the contract were signed by both parties. The original was faxed to Torco and signed only by the plaintiff in Illinois. Rivera Dep. at 146. The amended contract was signed by both parties in Illinois during Rivera's visit. Because *Leonardo's* teaches that it is where the plaintiff signs that is relevant, however, *see supra* note 7, we do not need to sort out this issue for now.

**14.** ITC's duties under the contract required it to arrange for gas to supply to Torco and to deliver that gas to a specified destination. The logistics of arranging for the delivery of gas did not bring ITC within the boundaries of Illinois, and although the place of delivery was changed about fifteen times, the contract originally provided for delivery in Oklahoma, Rivera Dep. at

152, and it does not appear that the substituted delivery destinations were any more in state. *Id.* at 149–52. Billing for the gas purchased by Torco pursuant to this contract was to be sent to Torco's Chicago office, and Torco no doubt would have mailed its payments from Illinois, but those limited connections can hardly be considered significant performance of contractual obligations in Illinois.

**15.** As indicated in the previous note, Illinois cannot be considered the intended venue for substantial performance of contractual obligations under this agreement. Place of performance, however, while relevant, is not a required precondition for a finding of "transaction of business." *See Jacobs/Kahan*, 740 F.2d at 590.

one state, such a clause evidences no intent or agreement to be sued and to be forced to defend in that same state. *Northern Trust*, 558 F.Supp. at 1123. Moreover, whatever force a choice-of-law provision has in its affirmative application, it is even less convincing that the choice of one state's law excludes the possibility that the defendant may have sufficient contacts with one or more of the remaining 49 states. In at least one case, jurisdiction was sustained despite a choice-of-law provision in the contract specifying an out-of-state forum. *Leonardo's*, 715 F.Supp. 949.[16] Here ITC failed to develop the argument that this choice-of-law provision should be construed to preclude Illinois jurisdiction; indeed, it does little more than repeat the language of the contract, which provides merely that "the formation and construction of this Agreement shall be governed by the laws of the State of Oklahoma." Without further explanation or evidence of this provision's purpose or intended effect, we decline to attach to it much jurisdictional significance.

### 2. *Arising Out Of*

■ A determination that a certain contact amounts to the transaction of business, however, is but half of plaintiff's battle. The muscles of the long arm cannot be fully flexed until the cause of action is found to arise out of that transaction. This requirement is uniformly interpreted as demanding only that the action "lie in the wake" of the in-state activity, *see Deluxe Ice Cream Co.*, 726 F.2d at 1215; *Jacobs/Kahan*, 740 F.2d at 591; *Hyatt Int'l Corp. v. Inversiones Los Jabillos, C.A.*, 558 F.Supp. 932, 935 (N.D.Ill.1982), and this language, in turn, is liberally construed. *See Ameritech Mobile Communications v. Cellular Communications*, 664 F.Supp. 1175, 1178 (N.D.Ill.1987). A cause of action for damages resulting from the breach of a contract negotiated and signed

in the forum state clearly satisfies this requirement. *See Hyatt v. Inversiones*, 558 F.Supp. at 935. Indeed, far more attenuated connections between the in-state transaction and the cause of action have been found to support jurisdiction. *See Jacobs/Kahan*, 740 F.2d at 591; *Deluxe Ice Cream*, 726 F.2d at 1215–16 (jurisdiction found where in-state discussion led to subsequent negotiations, which in turn led to the contract at issue). *But see Maurice Sternberg*, 577 F.Supp. at 887 (not arising out of where "offers and rejections [were] interposed between" visit to forum state and the agreement ultimately entered into). Here Torco is complaining that ITC breached the contract negotiated and entered into in Illinois. Even without the benefit of the relatively lenient standard that governs this issue, we would have no trouble finding Torco's cause of action to arise out of ITC's transaction of business in Illinois. We therefore conclude that ITC is amenable to Illinois jurisdiction under the long-arm statute.

### B. Due Process

■ Our inquiry does not end here, however. In addition to demonstrating that the statutory long-arm criteria are fulfilled, Torco must also satisfy us that the constitutional due process requirements are met before jurisdiction over ITC can properly be asserted. The due process analysis emphasizes the fairness and reasonableness of requiring a party to defend a suit in the forum state, *see Deluxe Ice Cream*, 726 F.2d at 1213 (citing *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1142 (7th Cir.1975), and as such requires only that the defendant have "certain minimum contacts" with that state so that jurisdiction does not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95

**16.** In that case, the contract out of which the cause of action arose, which contained a Wisconsin law provision, was not used by the court as the particular "transaction of business" on which jurisdiction was based; rather, the court found the contractual relationship at issue to grow out of earlier transaction of business in

Illinois, and this attenuated link sufficed to confer jurisdiction. This subtlety, however, does not detract from the fact that the court did not use the Wisconsin law provision to defeat plaintiff's claim that the defendant subjected itself to Illinois jurisdiction.

(1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940). To satisfy this requirement, the plaintiff must point to "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

ITC's contacts with Illinois in this case comfortably reach the "minimum contacts" threshold. Rivera's visit to Illinois in connection with ITC's gas purchase agreement with Torco goes a long way toward satisfying due process requirements; voluntary travel[17] to Illinois to transact business is considered an activity that "invokes the benefits and protections" of Illinois law. *Jacobs/Kahan*, 740 F.2d at 592; *Deluxe Ice Cream*, 726 F.2d at 1213. Especially where, as here, the relationship is initiated by the defendant, it becomes clear that the contact with the forum state is not incidental but intentional and purposeful, and to require him to defend a suit in that state hardly seems unfair. *Cf. Welles Products*, 563 F.Supp. at 449 ("initial call from [defendant's agent], as well as [his] visit to Illinois, suggest that [defendant] purposefully availed itself of the privilege of conducting business here"); *Ronco*, 539 F.Supp. at 400 (due process met where defendant "had clear notice that it was dealing with an Illinois corporation, and the instant suit ar[ose] from its efforts to serve a market for its products in Illinois").[18] We find these contacts to be constitutionally sufficient and consequently hold that ITC is subject to this court's jurisdiction.

17. There is no indication in the affidavits, depositions, or memoranda of which party requested that Rivera make the trip to Chicago. We must assume, therefore, that Rivera went voluntarily; it certainly would be improper for us, without any supporting evidence, to conclude that Torco prompted Rivera to come.

18. Alternately, the constitutional requirements are satisfied by Torco's allegations in its complaint of intentional misrepresentations rising to the level of fraud directed at the plaintiff. The Supreme Court has found jurisdiction constitutionally permissible where the defendants

## II. Amenability of Rivera and Caldwell as Individuals to Illinois Jurisdiction

In its complaint Torco names not only ITC but also its two owners, John Rivera and H. Jenks Caldwell, as defendants. Torco seeks to bootstrap personal jurisdiction for these two individuals from the contacts that we hold above to be sufficient to subject ITC to jurisdiction in Illinois. ITC argues, however, that these contacts cannot be used to establish jurisdiction over Rivera and Caldwell in light of the fiduciary shield doctrine. It is to this issue that we now turn.

### A. The Fiduciary Shield Doctrine

Where an individual's contact with a forum state is limited to acts performed in his representative capacity, the fiduciary shield doctrine directs that personal jurisdiction over that individual is improper. *Washburn v. Becker*, 186 Ill.App.3d 629, 134 Ill.Dec. 418, 420, 542 N.E.2d 764, 766 (1989); *Olinski*, 155 Ill.App.3d at 443–44, 108 Ill.Dec. at 239, 508 N.E.2d at 400. Clearly recognized under Illinois law, this doctrine has been consistently invoked, either by name, *see, e.g., State Security Insurance Co. v. Frank B. Hall & Co.*, 530 F.Supp. 94, 97 (N.D.Ill.1981), or at least by theory. *See, e.g., Hurletron Whittier, Inc. v. Barda*, 82 Ill.App.3d 443, 447, 37 Ill.Dec. 838, 841, 402 N.E.2d 840, 843 (1980).[19] The doctrine is rooted in the perceived unfairness of forcing "an individual to defend a suit brought against him personally in a forum in which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Marine Midland Bank, N.A. v. Miller*, 664

are "primary participants in an alleged wrongdoing intentionally directed at" a resident of the forum state. *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984).

19. The one case suggesting that this doctrine has not been adopted with full force in Illinois, *Hyatt Int'l Corp. v. Inversiones Los Jabillos, C.A.*, 558 F.Supp. 932 (N.D.Ill.1982), is challenged by the solid phalanx of cases applying the doctrine and is explicitly rejected by *Hyatt Corp. v. Club Regency Int'l*, No. 85 C 7540, 1986 WL 8029 (N.D.Ill. July 14, 1986).

F.2d 899, 902 (2d Cir.1981);[20] *accord, Washburn,* 186 Ill.App.3d at 632, 134 Ill. Dec. at 420, 542 N.E.2d at 766. This rationale suggests that, for the purpose of this doctrine, the distinction between pursuit of the corporate interest and pursuit of one's own interest is crucial; "self-interested actions [should] be considered [one's] own." *Marine Midland,* 664 F.2d at 903.

It follows from this underpinning that the fiduciary shield doctrine is not applicable when an individual acts on his own behalf. *See Club Assistance Program v. Zukerman,* 594 F.Supp. 341, 345 (N.D.Ill. 1984); *Franks v. Joe Eisenberger & Co.,* No. 85 C 7097, 1986 WL 2001 (N.D.Ill. Feb. 7, 1986). To avoid application of the doctrine a plaintiff need only allege in good faith that the performed acts advanced personal rather than employer interests. *See Brainerd & Bridges v. Weingeroff Enterprises,* No. 85 C 493, 1985 WL 2543 (N.D. Ill. Sept. 16, 1985); *Posen v. Marks,* 85 C 51, 1985 WL 671 (N.D.Ill. April 18, 1985) (rejection of fiduciary shield defense based on mere allegation in complaint that "defendant acted 'allegedly' on behalf of defendant").

### B. Exceptions to Application: Fiduciary Shield Doctrine as an Equitable Principle

But Torco does not make an allegation that Rivera and Caldwell were pursuing interests independent of the company's. Rather, it draws on the equitable nature of the fiduciary shield doctrine in arguing that it should not apply to these two individuals. It is well established that the fiduciary shield doctrine is an equitable principle, *see Washburn,* 186 Ill.App.3d 629, 134 Ill.Dec. 418, 542 N.E.2d 764 (1989), and as such is meant to be applied with discretion. *See id.; Bulova Watch Co.,* 508 F.Supp. at 1348. That the facts of a particular case seem to fall within the purview of the doctrine does not automatically warrant its application, *Washburn,* 186 Ill.App.3d at 634, 134 Ill.Dec. at 421, 542 N.E.2d at 767; a court should instead analyze the particular facts in light of the ultimate consideration of fairness before deciding whether the doctrine should bar jurisdiction. *See Marine Midland,* 664 F.2d at 903; *Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Premier Systems, Inc.,* No. 88 C 7703, 1989 WL 24122 (N.D.Ill. March 14, 1989).

Despite the injunction that application of the fiduciary shield doctrine should be determined on a case-by-case basis according to the particular facts presented, Illinois courts have carved out several standard exceptions to this doctrine. Most commonly discussed and invoked—and most significant for the purpose of the present dispute—is the "sham" or "alter ego" exception, relied on by Torco in response to ITC's fiduciary shield defense.[21] This exception applies "in cases where the plaintiff seeks

---

**20.** *Marine Midland* observed, however, that this doctrine "is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the long arm statute." 664 F.2d at 902 n. 3 (citation omitted); *see also Kula v. J.K. Schofield & Co.,* 668 F.Supp. 1126, 1129 (N.D.Ill.1987). *But see Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1347–48 (E.D.N.Y.1981). Although a Second Circuit decision, *Marine Midland* has been cited approvingly by the Northern District of Illinois. *See State Security,* 530 F.Supp. 94.

**21.** Two other exceptions have been discussed in prior cases but were not raised by Torco: the "insolvency exception," which allows a plaintiff to avoid application of the fiduciary shield doctrine where the defendant is insolvent, *see Continental Illinois,* No. 88 C 7703, and the "heinous activity" principle, which finds an exception where the defendant has personally engaged in "particularly heinous conduct." *Hyatt v. Club Regency,* No. 85 C 7540; *see also Veal Associates v. ICI Americas Inc.,* No. 86 C 7138, 1986 WL 13218 (N.D.Ill. Nov. 19, 1986). This last exception is based on dictum that appear in a footnote in *Posen,* No. 85 C 51. The court in that case held that the fiduciary shield doctrine was inapplicable in light of an allegation in the complaint that the defendant was acting in his own behalf. The court went on to observe, however, that "[b]ecause of the serious allegations of fraud, it might be that some exception to the doctrine would apply." We question the interpretation in *Hyatt* and *Veal* of this dictum as a separate exception to the fiduciary shield doctrine; certainly, the *Posen* court says nothing to indicate that it is not thinking of one ·of the existing exceptions when it suggests that one may apply. Indeed, "serious allegations of fraud" is descriptive of behavior that frequently triggers application of the sham exception.

to pierce the corporate veil by alleging that the corporation was a mere shell utilized by the individual defendant for his own personal benefit," *Hyatt v. Inversiones,* 558 F.Supp. at 936 (citations omitted), for while it appears on the face that the individual is acting in a representative capacity, he is in fact pursuing self-interest, and thus it "will not advance notions of fairness to allow the owner of the corporation to invoke the protections of the fiduciary shield doctrine." *Marine Midland,* 664 F.2d at 903. Where the alter ego exception is found to be applicable, therefore, a corporation's contacts are attributed to the individual. *Stuart v. Spademan,* 772 F.2d 1185, 1197 (5th Cir. 1985); *Ameritech,* 664 F.Supp. at 1179. To the extent it applies here, then, ITC's contacts, already found to be sufficient to sustain jurisdiction over the corporate defendant, can be used to bring Caldwell and Rivera within our jurisdiction. We consider first whether the exception is applicable and, second, whether it serves to strip Rivera and Caldwell of the protections afforded by the fiduciary shield doctrine.

1.  *Application of the Sham or Alter Ego Exception*

■ The alter ego exception is in many ways similar to the test used in determining whether to pierce the corporate veil, or disregard the corporate entity, and hold shareholders liable for corporate debts. *See Stap v. Chicago Aces Tennis Team,* 63 Ill.App.3d 23, 20 Ill.Dec. 230, 379 N.E.2d 1298 (1978) (laying out requirements for piercing the corporate veil). The alter ego inquiry, however, is less demanding: it eliminates the requirement that the sham corporation be used to perpetrate a fraud and questions merely whether the corporation is real or a shell. *Marine Midland,* 664 F.2d at 903; *Club Assistance,* 594 F.Supp. at 350 n. 18 (must prove piercing the corporate veil is warranted when a hearing is held). Moreover, as an element of the personal jurisdiction issue, the alter ego test is satisfied with a *prima facie* showing that the corporation is a sham, at least "[w]here, as here, the issue of personal jurisdiction is to be decided on written submissions before trial on the merits." *Kula,* 668 F.Supp. at 1130; *see also Ameri-*

*tech,* 664 F.Supp. at 1180 n. 3 (A court's review of allegations of a sham corporation "should not entail an extensive inquiry into the substantive merits of [the] claim," which should be challenged through a motion for summary judgment). A plaintiff therefore need only allege that the corporation is a mere shell, *see Hyatt v. Inversiones,* 558 F.Supp. at 936; *Brainerd,* No. 85 C 493, and these allegations must meet the very low threshold of "minimally viable"—which requires only that the allegations not be "patently without merit"—to support jurisdiction. *See Ameritech,* 664 F.Supp. at 1180 n. 3. In light of this lenient standard, application of the alter ego exception is refused only where no facts are alleged supporting a finding that the corporation is a sham, *see State Security,* 530 F.Supp. at 98; *Veal Associates,* No. 86 C 7138 (N.D.Ill. Nov. 19, 1986), or where the supporting evidence is so manifestly insufficient that the alter ego argument is not even minimally viable. *See Kula,* 668 F.Supp. at 1129–30 (alter ego argument found to be legally insufficient where plaintiff argued only that the individual was chairman of the board, chief executive officer and sole shareholder of the corporation); *Hyatt v. Club Regency,* No. 85 C 7540 (alter ego argument rejected where only evidence in support was a reference to the vice president of one company as the sales manager of the individual defendant).

There is no definitive enunciation of the components of a "minimally viable" allegation of a sham corporation; as an equitable principle, the alter ego exception embodies a certain fluidity of elements, more responsive to the facts of an individual case than to any overriding set of criteria. Some courts turn to corporation case law and seek to match their facts to the requirements of the "piercing of the corporate veil" doctrine. In *Ameritech,* for example, the court, quoting *Van Dorn Co. v. Future Chemical and Oil Corp.,* 753 F.2d 565, 570 (7th Cir.1985), cites four factors considered by Illinois courts when determining whether a corporation is a sham:

"(1) the failure to maintain adequate corporate records or to comply with corpo-

rate formalities, (2) the commingling of funds or assets, (3) under-capitalization, and (4) one corporation treating the assets of another corporation as its own."

*Ameritech,* 664 F.Supp. at 1179; *see also Club Assistance,* 594 F.Supp. at 351. A significant number of recent cases, however, have diverged slightly—but unanimously—from the *Ameritech* approach. These cases teach that the sham argument will be successful at the personal jurisdiction level if the plaintiff can make out a *prima facie* case that the corporation is a sham "in that it lacks assets *or* is defendant's alter ego." *Washburn,* 186 Ill. App.3d at 633, 134 Ill.Dec. at 421, 542 N.E.2d at 767 (emphasis added); *accord, Continental Illinois,* No. 88 C 7703; *Veal Associates,* No. 86 C 7138; *Hyatt v. Club Regency,* No. 85 C 7540; *Brainerd,* No. 85 C 493. These various tests cannot be sorted out in the abstract, for the analysis must ultimately rest on fairness in the individual situation; instead, with these articulations in mind, we turn to the facts of the case.

While not nominally alleging in its complaint that ITC was undercapitalized, Torco does allege facts supporting such an argument:

> 22. On information and belief, Caldwell has put no more than $25,000 in capital into ITC over a period of time. Rivera has allegedly contributed the same amount in computer equipment and programs.

**22.** In January of 1989, for example, Innovative's cash holdings were $205.95. Edwards Dep. at 57–58. Although there is some indication that capitalization is measured at the time of incorporation, *see* 1 W. Fletcher, *Cyclopedia* § 44.1, the court in *Gallagher* took into consideration the weekly withdrawals that reduced the capital there to below its initial level. 91 Ill.App.3d at 1006, 47 Ill.Dec. at 559, 415 N.E.2d at 564. Here, under either measure, we have no difficulty in concluding that ITC was undercapitalized.

**23.** The agreement between Torco and ITC contained no provisions purporting to limit ITC's liability in the event of non-performance; quite the contrary, in addition to the liability for breach that is implied in certain provisions, the contract included several provisions explicitly enumerating ITC's potential liability. Supple-

> 23. ITC has never had any income and all of its expenses, including salaries to its officers, have been paid from the capital contribution of Caldwell.

(First Amended Complaint at 5.) Moreover, Torco explicitly lays out the argument in subsequent supporting memoranda. ITC does not contest Torco's representations of its financial history and condition but, rather, argues that, because its obligations under the contract with Torco did not require any financing by ITC, its admittedly limited resources do not amount to under-capitalization. This position is not tenable. Adequate capitalization is measured not against the amount that may be required to fulfill a certain contractual obligation but rather against the business to be done and the risk of loss; the concept contemplates capital reasonably adequate for prospective liability. *Stap,* 63 Ill. App.3d at 28–29, 20 Ill.Dec. at 234, 379 N.E.2d at 1302; *Gallagher v. Reconco Builders,* 91 Ill.App.3d 999, 1005, 47 Ill. Dec. 555, 559, 415 N.E.2d 560, 564 (1980); *see also;* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 44.1 (rev. perm. ed. 1983). ITC's initial $50,000 in cash and assets, supplemented by subsequent loans but depleted even more by subsequent withdrawals,[22] is clearly inadequate when compared to its business undertaking; regardless of whether ITC's role in this transaction was that of broker or actual supplier, its multimillion dollar contract with Torco exposed it to a massive damage claim,[23] and ITC simply does not

menting, for example, the implied assumption of responsibility for liability contained in the provision that "Seller agrees to deliver to buyer all Gas necessary to meet Buyer's requirements" or that "all Gas delivered by Seller ... shall conform to [certain enumerated] specifications" or that "Seller warrants title to the Gas delivered to Buyer, and warrants that Seller has the right to sell the Gas and that such Gas is free from liens and adverse claims of every kind," are other more explicit provisions: "Seller agrees to indemnify and hold Buyer harmless for any pipeline penalties which result from the over or under deliveries of gas by Seller when said deliveries are not in accordance with Buyer's nomination"; "Seller shall be deemed in possession, solely liable and responsible for said Gas prior to ... passage of title"; "Each party shall indemnify the other for and save it harm-

have sufficient funds on which to rely should something go wrong.

The *Washburn* line of cases cited *supra* suggests that under-capitalization alone is enough to sustain an alter ego argument, and this position gains support from the frequently repeated pronouncement in Illinois opinions that "[a] corporation's capitalization is a major consideration of courts in deciding whether a legitimate separate corporate entity was maintained." *Amsted Industries v. Pollak Industries*, 65 Ill. App.3d 545, 552, 22 Ill.Dec. 73, 79, 382 N.E.2d 393, 399 (1978); *accord, Gallagher*, 91 Ill.App.3d at 1005, 47 Ill.Dec. at 559, 415 N.E.2d at 564. Indeed, one court has observed that inadequate capitalization alone is grounds for " 'denying the separate entity privilege' " of insulating shareholders from liability. *Stap*, 63 Ill.App.3d at 29, 20 Ill.Dec. at 234, 379 N.E.2d at 1302 (quoting Ballantine on Corporations 302–03 (rev. Ed. 1946)). This argument is especially forceful where, as here, the plaintiff would be unfairly prejudiced because adherence to the concept of the corporation as a separate entity would prevent full recovery. *Cf. Hyatt v. Club Regency*, No. 85 C 7540 (no exception to fiduciary shield doctrine where no evidence of unfair prejudice because plaintiff "has not argued that it can obtain full recovery only if [individual] defendants are brought in"); *Veal Associates*, No. 86 C 7138 (same). But despite this authority, we know of no case that has found a corporation to be a mere shell based solely on its capitalization status. That is not to say that undercapitalization alone is insufficient; rather, in those cases where under-capitalization was a factor, it was supplemented by other factors also weighing in favor of disregarding the corporate entity, and thus the precise question was never forced. So here also do other relevant factors enter into the inquiry, and we choose not to rest our finding on the independent sufficiency of under-capitalization.

While not commingled in a literal sense, ITC's finances appear to be wholly dependent on certain ostensibly unrelated Caldwell enterprises. Taking the place of the income that has, from its inception, eluded ITC are loans from various Caldwell entities. *See* Edwards Dep. at 39, 41. These loans amounted to $149,999.51 in February, 1989, and have since increased (*id.* at 54–55). ITC signed no notes for these loans (*id.* at 37), although they do appear in the books of the Caldwell entities. Interest on these loans was not agreed upon or calculated at the time the loans are made; rather, at the end of the fiscal year, auditors added interest to ITC's obligation (*id.* at 37–38).

In addition to these general loans, Caldwell's other concerns have made a significant number of specific expenditures on behalf of ITC. Rivera's trip to Chicago to discuss the proposed gas contract with Torco and various other ITC business expenses—adding up to $43,541.48—were charged to a Diner's Club credit card for which Caldwell Aircraft Trading Company was responsible (Edward's Dep. at 25, 44; Rivera Dep. at 114). Caldwell Aircraft Trading Company additionally paid over $8,500 in consulting fees to an oil and gas engineer hired by ITC and $10,000 to another company providing consulting (*id.* at 43), legal and accounting fees on behalf of ITC (*id.* at 32, 45), rent for a house for Rivera (*id.* at 33), rent for the office space in Florida used by ITC (Rivera Dep. at 5, 106), a telephone bill corresponding to ITC's number (*id.* at 35), over $5,000 in freight charges for ITC cargo (*id.* at 45), and office supplies and expenses attributable to ITC (*id.* at 55). Caldwell entities also made loans to third parties on ITC's behalf (Edwards Dep. at 44–46).

That these loans and expenditures are carried on Caldwell Aircraft's books and are formally not gratuitous does not convince us of ITC's underlying fiscal independence. Although appearing in Caldwell Aircraft books, these obligations are apparently not recorded in ITC's accounting records; indeed, ITC has neither an accountant nor any transaction books (Rivera

---

less form, any and all damages, injuries, or liabilities cause [sic] by the Gas in its possession

and not due to or contributed to by the act or omission of the other party."

Dep. at 82). No repayment on this debt has occurred—indeed, ITC's financial condition would seem to preclude it from fulfilling these "obligations"—and, apart from the loans, it does not seem that any interest has accrued. Moreover, the sheer comprehensiveness of the expenses covered by Caldwell Aircraft, especially in light of the limited business transacted by ITC, in addition to the fact that the charges were specifically and directly paid by Caldwell Aircraft rather than paid indirectly through a loan to ITC, suggest that, far from an arm's-length transaction, this repeated behavior reflects the total assumption by Caldwell Aircraft of ITC's financial responsibilities.

Finally, Torco points to several examples of ITC's dependence on Caldwell's other enterprises, apart from the financing of ITC's operations, that suggest that ITC is not—and is not presented as—an independent entity. In its complaint, Torco alleges:

19. Rivera sent Torco the financial statements of Charlotte Aircraft Corporation and Subsidiaries as evidence that ITC was properly capitalized to engage in ... [the] transaction with Torco and that Caldwell provided financial substance to ITC.

20. Rivera also suggested to Ken Crow that Torco contact North Carolina National Bank ("NCNB") to confirm Caldwell's financial substance and integrity.

(First Amended Complaint at 4.) While ITC protests that this financial information was used merely "to show the experience of stockholders of ITC in the aviation industry since our cogeneration business is based on aero derivative gas turbines," (Rivera Dep. at 17), Torco's view as expressed in its complaint that this information was intended to impute to ITC the financial stability of other Caldwell corporations is certainly plausible. Indeed, Wilkins, a Torco vice-president, specifically asked for financial information regarding ITC, but none was given. *Id.*

Bolstering the dependence argument is the fact that certain paper work concerning the transaction between Torco and ITC was mailed to Caldwell's office (First Amended Complaint at 5); although Rivera is allegedly unconnected to Caldwell's other concerns located in North Carolina, he at one point adverts to "my office in Charlotte" (Rivera Dep. at 54). Torco observes additionally that the employees of ITC are also employed by other Caldwell corporations, and although this unity of employees alone does not refute the separate identity of ITC, the fact that they receive only one check—from Charlotte Aircraft Corporation—is significant. *See* Edwards Dep. at 5. Even Rivera, allegedly unconnected to Caldwell's other concerns, receives only advances from ITC—and those come out of a Caldwell corporation's pocketbook (Edwards Dep. at 36–37). Torco relies finally on an affidavit submitted by Dennis James Cousino, the president of a company with whom ITC–Oklahoma had done business. In this affidavit Cousino states the "all payments we received pursuant to the contract [with ITC] were paid by Caldwell Aircraft, Charlotte Aircraft Corporation or Charlotte Aerospace," and that his company agreed to the contract "because we were led to believe that H. Jenks Caldwell and his companies stood behind ITC" (Cousino Aff. at 2). ITC–Oklahoma is admittedly not the same corporation as the ITC with whom Torco contracted, but they are related and, therefore, Cousino's testimony, while not conclusive on the dependence issue, certainly supports the argument.

We recognize that a slight blurring of the lines or a close relationship between two corporations does not alone warrant a court to disregard the corporate identity of one, *see Stuart v. Spademan*, 772 F.2d 1185 (5th Cir.1985), but here the blurring is more than slight, and one could easily conclude that the identity of ITC is subsumed in the other Caldwell corporations. When added to the gross undercapitalization, this evidence of ITC's almost complete dependence certainly amounts to a "minimally viable" allegation that ITC is a mere shell.[24]

---

**24.** It seems clear that at this stage, Torco does not need to show that the sham corporation was

**140**

We therefore find that the sham exception to the fiduciary shield doctrine is applicable to ITC.

### 2. Effect on Caldwell and Rivera's Fiduciary Shield Protection

■ We decline, however, to allow this finding to lower the fiduciary shield with respect to Rivera and Caldwell *as individuals*. The same facts that support the allegation that ITC may be a shell suggest that it is the alter ego, not of Caldwell himself or of Rivera, but of one of Caldwell's companies. The loans extended to ITC, and the money spent to cover Torco's expenses, were drawn from Caldwell's companies' financial resources, and the financial statements sent to Torco imputed Caldwell's companies' legitimacy to ITC. There is no suggestion that ITC was used for the *personal* benefit of Caldwell and Rivera, and no evidence that ITC's finances were commingled, even in a loose sense, with personal funds. In short, Torco makes its alter ego argument without regard to whose alter ego ITC actually is, and the allegations and evidence suggest that it is a Caldwell company that is the face behind the mask.

Although prior case law has not considered the possibility of limiting the force of the alter ego exception by inquiring into *who* is the controlling power behind the sham corporation, we do not believe that this omission is attributable to a belief that the exception is absolute; rather, it is likely due to the fact that the fiduciary shield doctrine is a "thorny jurisdictional issue involving a legal doctrine that continues to evolve." *Schubert v. Gay & Taylor, Inc.,* 716 F.Supp. 1129, 1131 (N.D.Ill.1989). Certainly the concept of piercing the corporate veil is not limited to those situations where a plaintiff is trying to reach the individuals behind the corporation. *See* Fletcher, *Cyclopedia* § 41.10 ("A corporation may be the alter ego of another corporation and where this occurs the distinct corporate entity will be disregarded and the two corporations will be treated as one"); *Federal*

*Ins. Co. v. Maritime Shipping Agencies,* 64 Ill.App.3d 19, 30, 20 Ill.Dec. 664, 671, 380 N.E.2d 873, 880 (1978). Indeed, in *Amsted Industries*, the court, in a substantive corporations law context, made precisely the distinction that we find significant here:

the degree of interrelatedness of the two corporate defendants is irrelevant to the issue of this appeal which is the personal liability of Pollak. Evidence that the affairs of the two corporations were interwoven relates to the liability between the two corporations, rather than the personal liability of Pollak. That the two corporations may have been operated as one does not mean that some legitimate corporate entity did not exist to shield Pollak from personal liability.

65 Ill.App.3d at 550, 22 Ill.Dec. at 77, 382 N.E.2d at 397.

Moreover, limiting the force of the alter ego exception makes sense in light of the theory and operation of the exception. The alter ego exception is powered by the rationale that it is unfair to apply the fiduciary shield doctrine where the corporation is a facade for another's interests; this inquiry looks to *whose* interest is actually promoted by the fiduciary's acts. And the exception serves to attribute contacts of the corporation with the forum state to the alter ego. Here, Torco's showing that ITC is a sham permits us to attribute ITC's contacts with Illinois to Caldwell's other corporations. To reach Caldwell himself or Rivera would require the additional step of showing that these other corporations are themselves mere shells. This Torco has not done. We therefore hold that the fiduciary shield doctrine prevents us from asserting jurisdiction over Rivera and Caldwell in their capacity as individuals.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of personal jurisdiction is denied with respect to defendant

---

used to perpetuate a crime or fraud; the *Washburn* line of authority does not require such a showing, and even *Ameritech* calls for the full "piercing of the corporate veil" inquiry only

when the issue is considered at a hearing. We note, however, without exploring the issue, that Torco does allege in its complaint a count of fraud.

Innovative Thermal Corporation and granted with respect to defendants Rivera and Caldwell.